JOHN DIRKEN *vs.* GREAT NORTHERN PAPER COMPANY.

Penobscot.   Opinion April 5, 1913.

*Appreciated Danger.   Assumption of Risk.   Compensator.   Constitution.*
*Defect.   Due Care.   Electricity.   Injuries.   Knowledge of Danger.*
*Machinery.   Master and Servant.   Negligence.   Police*
*Power.   Public Laws of 1909, Chapter 258.   Safe*
*Place.   Superintendent.   Vice Principal.*

The negligence relied upon is that the plaintiff was set to work by the defendant in a place which was not reasonably safe, without warning or instructing him as to the danger he would encounter in painting over or around the compensator.

*Held:*

1.  That the duty imposed upon a master to warn his servant of dangers attendant upon the place of employment of which the master has knowledge, and which are unknown to the servant, is a personal duty.

2.  The servant has the right to look to his master for the discharge of that duty.

3.  If, instead of discharging it himself, the master employs another to do so, then that other stands in the place of the master and becomes a substitute for him, a vice principal in respect to the discharge of that duty.

4.  The master then becomes liable for the acts and negligence of such other person in the premises to the same extent as if he had performed these acts and was guilty of negligence personally.

5.  That the servant assumes the ordinary, apparent risks of his employment, he does not assume the risks from defects not apparent, of which he has

no knowledge in the plant and which the master is bound to make and keep reasonably safe.

6. That the fact that a person takes voluntarily some risk is not conclusive evidence that he is not using due care, nor is the knowledge of a danger, not fully appreciated, conclusive that the risk is his.

7. That the State, in the exercise of its police power, may enact such laws for the safety and protection of its citizens as the circumstances and necessities of a particular class may require without violating any constitutional guaranty.

On motion and exceptions by the defendant. Motion and exceptions overruled.

This is an action on the case by John Dirken against the Great Northern Paper Company to recover damages for personal injuries sustained on the 7th day of July, 1911, on account of the negligence of the defendant. The action is brought under Chapter 258 of the Public Laws of 1909, otherwise known as the "Employers' Liability Act." Plea, the general issue. In the course of the trial, the defendant's counsel requested the presiding Justice to instruct the jury that there is no evidence that Dickinson was employed as a superintendent, whose sole, or principal duty, was that of superintendent, so that the defendant can be held liable for the negligence of Dickinson under Chapter 258 of Public Laws of 1909.

That Chapter 258 of the Public Laws of 1909 is repugnant to and in conflict with the Constitution of the United States and the Constitution of Maine. Plea general issue.

That the jury be instructed to return a verdict for the defendant, which instructions the presiding Justice declined to give. To which refusal to so instruct, the defendant excepted. The jury returned a verdict for the plaintiff for $4,000 and the defendant filed a general motion for a new trial.

The case is stated in the opinion.

*Hersey & Barnes,* for plaintiff.

*E. C. Ryder,* for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, KING, BIRD, HANSON, JJ.

HANSON, J. This is an action for personal injuries sustained by the plaintiff while employed as a painter in the paper mill of the

defendant company at Millinocket, and is brought under Chapter 258, Public Laws of 1909, entitled, "An Act relating to the employment of Labor."

The plaintiff obtained a verdict for $4,000. The case comes before this court on general motion to set aside the verdict, and on exceptions to the ruling of the presiding Justice, involving, among other things, the constitutionality of the before mentioned Act.

The following are the material provisions:

Sec. 1.   If personal injury is caused to an employee, who, at the time of the injury, is in the exercise of due care, by reason of:

First, a defect in the condition of the ways, works or machinery connected with or used in the business of the employer, which arose from, or had not been discovered or remedied in consequence of, the negligence of the employer or of a person in his service who had been entrusted by him with the duty of seeing that the ways, works or machinery were in proper condition; or

Second, that the negligence of a person in the service of an employer who was intrusted with and was exercising superintendence and whose sole or principal duty was that of superintendence, or in the absence of such superintendent, of a person acting as superintendent with the authority or consent of such employer.

Sec. 8.   The provisions of the seven preceding sections shall not apply to injuries caused to domestic servants or farm laborers by fellow employees, or to those engaged in cutting, hauling or driving logs.

The plaintiff was injured on the seventh day of July, 1911, while engaged in the service of the defendant as painter in a crew of painters, employed in and about the defendant's pulp and paper mill.   He had been employed at various times during a period of twelve years and had worked in all the rooms of the mill, and once before in the room where the injury occurred.   This room is known as the wet room, its dimensions, 60 feet by 200 feet.   In that room was installed a motor, a switch-board, and connecting compensator, also called a step-down transformer.   The motor is $3\frac{1}{2}$ feet from the case of the compensator; the switch-board, 4 feet 6 inches from the compensator, which is 19 inches wide, 31 inches high, and 13 inches deep; the three pieces being located in the northeast corner of the room, the compensator standing a few inches from the wall,

its top being 5 feet, 5¼ inches above the floor. There are six wires running up to the compensator; three of these come from the electrical plant, or switch, and the other three run from the compensator to the motor. The wires running to the compensator under the floor, built especially to protect them, pass through porcelain tubes, up the sides of the wall, behind the compensator, and at the top of the compensator turn and enter the terminal blocks, so called, which are screwed on to the top connection of the compensator. The wires terminate there in a flat connection with the terminals, so called; the terminals being 1¼ inches by 3 inches, the wires are soldered to the terminals and these are clamped down to the top of the compensator by two bolts. There are two rows of these, with two bolts to each terminal, making twelve bolts altogether, six in each row, the terminals, bolts and nuts are not insulated.

For several days prior to the accident the plaintiff had been employed with others in painting the wall of that room. They were under the immediate control of one Rankin Dickinson, foreman of the crew, whose duty as described by himself, was to look after the painting. On the morning of the injury the plaintiff was ordered by the foreman to repaint a portion of the wall above the compensator, and in following the instructions of Mr. Dickinson, he claims the injury occurred.

The plaintiff's account is this:—he had worked for some years for the defendant, and on one occasion, painted in the same room, but had not worked on or about the compensator, and had received no warning as to any danger attending the work. On the day of the accident he was painting in the wet room, when Mr. Dickinson came to him and said, "John, I want you to go back and paint over that transformer and in the corner." . . . "I went and did the work. My ladder went up against the wall . . . and there was nothing over the transformer. . . . The paint pail was hooked on the first round of the ladder and hung below the second round. It was secured to the ladder by a short rope with a hook on each end, one on the bail, the other on the first round of the ladder, permitting the pail to hang down."

He continues, "I got up on my ladder and after putting my pail there, some fellow hollered over on some of the machines. I

turned around and looked. I saw it was some of the fellows,—I didn't bother my head about it. I thought it was Dick, first, hollering, and I went to put my brush into the pail and I looked down. I don't know what drew my attention to look down, but my brush was held like that (illustrating). I can't say what was the cause of it, but there was a kind of blue haze come up all at once. When it did I took a kind of a jump, like that, on the ladder. That is all I remember; I don't know what happened." Q. After the blue blaze, did you see any other flash? A. I didn't have time to see nothing. Q. Did you hear any noise? A. I was knocked from my ladder back into a blaze of fire.

As a result of the accident, the plaintiff was burned about the face, neck, arms and hands, and has lost the use of his hands.

THE MOTION. It is contended for the plaintiff that there was actionable negligence on the part of the defendant company in two particulars at least: 1. The use of a compensator without adequate protection or shield, while the plaintiff, who was unacquainted with its use, was painting over the compensator when it was in operation. 2. That the defendant did not warn the plaintiff of the danger of painting over or near the compensator while thus in use.

There was evidence tending to show that the plaintiff had painted in the same room once before without injury, or apparent knowledge of danger; that at the time of the accident he had no knowledge or appreciation of the peril involved. It is conceded that he had been warned to avoid contact with wires, and the evidence tends to show that he heeded that warning, but he contends that here there were no live wires, or wires of any kind to remind him of the warning or prompt him to use the caution so necessary to avoid injury, that on receiving the order to paint above the compensator he at once obeyed and made such preparations as were necessary. He raised the only available ladder to position, a ladder furnished by the master, and in the only position suitable for painting the wall pointed out to him by the foreman, and ascended the ladder to the point where his judgment dictated the paint pail should be attached, and there attached it to the first round of the ladder.

The plaintiff claims that while on the ladder above the compensator and in the act of painting, and in the exercise of due care, an explosion occurred. While he is not able to explain the cause of the explosion, his testimony indicates, and it is conceded, that contact, either directly or indirectly, with the exposed, uninsulated portion of the top of the compensator caused the fire and explosion, resulting in his injury. The plaintiff claims that the compensator was not furnished with an adequate covering to protect or warn the workmen. A few days before the accident the electrician in charge had caused a covering of canvas to be made and nailed to a frame 22 inches square, to protect the compensator from falling dust or paint, and moisture, but at the time of the accident the testimony is overwhelming that there was no covering over the compensator.

So far as the case discloses, no covering had been used on the compensator until a few days before the accident, and its use for the intervening days was irregular. The testimony shows that there was burning paint on the top of the compensator and on the floor after the explosion, while the covering was found afterward, standing against the wall, untouched by fire or paint. The theory of the plaintiff is that the paint from the plaintiff's brush dropped on the compensator, and coming in contact with the exposed parts of the nuts, bolts and terminals, caused first the flash of fire, and then an explosion, burning the arms, hands and body of the plaintiff, enveloping him "in a blaze of fire."

The plaintiff was a common laborer and was so employed on this occasion. He knew that electricity was being used as a motive power and had a general knowledge of the dangers of coming in contact with live wires, but had no information as to the particular danger of working over the compensator, or of its construction, or of any means to be adopted to avoid danger. He was not informed of any danger from contact with any part of the top of the compensator, and was not instructed in regard to the care to be observed by him and had received no warning and did not appreciate the danger.

The defendant's counsel contends, that at the time of the accident the plaintiff was in charge of Rankin S. Dickinson, a head-painter, that Dickinson had no authority to hire or discharge men

and was himself under the direct supervision of one Thorndike, who was a superintendent in the immediate charge of the painting crew; that the plaintiff had worked in and about the defendant's mill for many years, and knew, or ought to have known, the dangers attending the work, that he had been warned to look out for the wires and was familiar with the conditions existing in the room in question; that on a certain occasion on being cautioned to look out for wires, he had stated, in substance, that he could take care of himself, and that he knew "most as much about electricity as any of the electricians around there." And defendant contends, 1. "That the plaintiff assumed the risks and dangers incident to his employment, if he knew and appreciated them, and the evidence shows he must have known and appreciated them, for the risks and dangers were such that a person of his capacity and intelligence ought to have known and appreciated them." 2. "That the accident was caused by the negligence of the plaintiff." 3. "That there was due care on its part, that there was sufficient protection over and above the compensator, that a few days before the accident a shield was placed over the compensator to protect it from falling paint and dust." In effect, that it had done all that was necessary to be done under the circumstances, that the shield was sufficient protection, and that the plaintiff assumed the risk.

Rankin S. Dickinson, called by the defence, testified that his business was that of "a head-painter," that he had been in the employ of the defendant in that capacity for about one year, that his duties were to look after the painting, that he helped to shift the staging, and did some painting with the crew. This is the only testimony as to the scope of his work, except that he added, "We most generally painted the most dangerous places on Sunday, when the machine was shut down." Mr. Dickinson testified that he saw the covering over the compensator about twenty minutes before the accident. He was coming from the blowpit room at the time of the accident. He was asked, Q. What was the first thing you saw? A. I saw fire fly out. I heard the explosion, and then I saw Dirken come out from around underneath the rope-drive. Q. What instructions did you give Mr. Dirken in regard to painting that morning? A. I was coming down the floor and I met Mr. Dirken,—I think he was just coming over from getting a pail

of paint; I met him on the floor and I asked, I says, "Jack, will you give some of those dark spots a second coat?" and he nodded his head and walked on.  Q.  And those are all the instructions you gave him in regard to painting that morning?  A.  Yes, sir. . . . I warned him to look out for the wires.  There were bare wires in there, and they had to paint around there, and I warned him to be careful around them, and if he saw any bare wires to report to me or any of the electricians, and they would have them covered. . . .  Q.  Did you warn John Dirken of the danger that might arise from contact with the transformer?  A.  No, sir. Q.  Or the compensator?  A.  No, sir. . . .  Q.  Could you tell whether or not, if the painters were painting on the ceiling of that basement room in the beater room, directly over the compensator,—whether or not there is a platform built right there for protection?  A.  I believe there is, that covers the motor; I don't know whether it covers the compensator or not.  Q.  You don't know now, what the compensator is, do you?  A.  No, I don't know exactly what it is; I have seen what they call one."

The negligence relied upon in this case is that the plaintiff was set to work by the defendant in a place which was not reasonably safe, without warning or instructing him as to the danger he would encounter in painting over or around a compensator.

The duty imposed upon the master in such a case has been defined in successive cases in this State, constituting an unbroken and harmonious line, and hold substantially as in the recent case, *Hume* v. *Power Co.*, 106 Maine, 78.  "The duty imposed upon a master to warn his servant of dangers attendant upon the place of the employment, of which the master has knowledge, and which are unknown to the servant, is a personal duty.  The servant has the right to look to his master for the discharge of it.  If, instead of discharging it himself, the master employs another to do so, then that other stands in the place of the master, becomes a substitute for him, a vice-principal, in respect to the discharge of that duty, and the master then becomes liable for the acts and negligences of such other person in the premises to the same extent as if he had performed those acts and was guilty of the negligence personally."

*Welch* v. *Bath Iron Works,* 98 Maine, 366. See also *Small* v. *Manufacturing Company,* 94 Maine, 551; *Sawyer* v. *Paper Company,* 90 Maine, 354; *Cowett* v. *Woolen Co.,* 97 Maine, 543.

While it is settled law that a servant assumes the ordinary apparent risks of his employment, he does not assume the risk from defects not apparent, of which he has no knowledge in the plant itself which the master is bound to make and keep reasonably safe. *McCafferty* v. *Maine Central R. R. Co.,* 106 Maine, 284.

The fact that a person takes voluntarily some risk is not conclusive evidence, under all the circumstances, that he is not using due care. Nor is the knowledge of a danger, not fully appreciated, conclusive that the risk is his.

*Frye* v. *Bath Gas & Electric Light Co.,* 94 Maine, 16.

The burden is on the plaintiff to show affirmatively that no want of due care on his part contributed to the injury.

*McLane* v. *Perkins,* 92 Maine, 39; *Day* v. *Boston & Maine R. R.,* 96 Maine, 207; *Fournier* v. *Mfg. Co.,* 108 Maine, 357; *Donaldson* v. *New York, N. H. & H. R. R.,* 188 Mass., 484.

These questions are for the jury.

*Glass* v. *Hazen Confectionery Co.,* 211 Mass., 99; *Holder* v. *Massachusetts Horticultural Society,* 211 Mass., 370.

It is the theory of the defendant that the plaintiff, on preparing to paint, deliberately set his pail on the top of the compensator, or hung it so close that it came in contact with the compensator, and thus caused the accident, and that this conclusion is inevitable because there are three holes in the bottom of the pail which fit closely over three bolt-heads to be found on the top of the compensator; and they were noticed in the bottom of the pail immediately after the accident. And the defendant says that it is conclusive evidence of the carelessness of the plaintiff and negligence on his part, which entirely excuses the defendant, because the plaintiff knew, or ought to have known, that placing his pail on the top of the compensator would be followed by an explosion which might injure him, and that it is not liable because the plaintiff ought to have known of the dangers lurking in the compensator, and that the careless act of plaintiff was the proximate cause of the injury—and further, that in the event the plaintiff did not know or appre-

ciate the danger, that his injuries were due to the negligence of a fellow-servant and consequently not the fault of the defendant. The plaintiff's counsel in reply to this says that, if it is true that the plaintiff deliberately set his pail on the top of the compensator, as claimed by the defendant, it is conclusive evidence in itself that he did not appreciate the danger, and that it is immaterial whether Dickinson was a fellow-servant or not so long as he was entrusted with a duty by the master, which he neglected to perform, or could not perform. The neglect of that duty by Dickinson was the neglect of the defendant. *Frye* v. *Electric Co.,* 94 Maine, 16.

It is not denied that there was a special latent danger attending the work over and about the compensator, and it is apparent that the plaintiff did not know of the special risk and danger, and had not been warned or instructed by the defendant, or any of its servants or agents. Not having such knowledge, or warning, he did not assume the risk and dangers incident to his employment. Neither can it be held that he ought to have known and appreciated them, or that the accident was due to his own negligence.

There is nothing in the case to support the claim that he knew, or ought to have known, of the danger; on the contrary it is incredible that, knowing of such danger, or having reason to know, he should either deliberately place his paint pail on the compensator, or place it on the ladder in such position that it would come in contact with it. This conclusion is justified by his own testimony and the testimony of Mr. Dickinson, who testified in effect that he did not know about the dangerous character of the compensator himself, and therefore could not instruct another, and did not instruct the plaintiff.

These questions, together with the question whether the risk of the injury which the plaintiff suffered was so obvious or known to him as to have been assumed by him, and whether the plaintiff when injured was in the exercise of due care, and whether the defendant had failed in the duties of furnishing a reasonably safe place, and properly instructing and warning the plaintiff as to hidden dangers and defects in the compensator, were submitted to the jury under clear and appropriate instructions. A careful examination of the testimony discloses that the claims of the plain-

tiff are supported by the weight of evidence and fully justify the verdict of the jury, and entitle the plaintiff to judgment unless the defendant's exceptions require a different conclusion.

That the jury erred in the amount of damages awarded is not urged.

THE EXCEPTIONS are to the refusal of the presiding Justice to instruct the jury:

1.   That "there is no evidence that Dickinson was employed as a superintendent, whose sole or principal duty was that of superintendence, so that the defendant can be held liable for the negligence of Dickinson in the premises."

2.   That "Chapter 258 of the Public Laws of 1909, entitled 'An Act relating to the employment of Labor,' is repugnant to, and in conflict with, the Constitution of the United States, and the Constitution of the State of Maine."

3.   "To return a verdict for the defendant."

1.   As to the first exception, we find no difficulty in holding the ruling to be correct. A careful reading of the testimony will disclose that Mr. Dickinson's principal duty was that of superintendence. The evidence shows that he did not work with his hands the greater portion of the time, and for the time being at least was not "a mere laborer in charge of a gang of men." See *Gardner* v. *Telephone Co.,* 170 Mass., 156. Counsel have cited many cases from the Massachusetts court as to who may be a superintendent, and are not in disagreement as to the law. We think the evidence sustains the ruling that Mr. Dickinson did measure up to the requirement of section two of that Act.

2.   It is conceded by counsel for the defendant that the question of the constitutionality of Chapter 258 of the Public Laws of 1909, or an act similar thereto, has never been raised, and his chief objection is that the exemption clause includes those engaged in cutting, hauling and driving logs,—that such classification is wholly arbitrary, unjust and an unreasonable discrimination against all such persons. He contends further that it imposes burdens upon one class of employers not imposed upon employers conducting a *like hazardous business.* That this violates the equality clause of the Fourteenth Amendment, and is as well a violation of Sec. 19 of the Declaration of Rights of the Constitution of Maine.

Counsel urges that the business is substantially the same, "a like hazardous business," and that no valid reason can be found for exempting from the provisions of the statute that great class of employees engaged in cutting, hauling and driving logs.

In support of his contention defendant's counsel cites and relies upon *Gulf, Colorado, and Santa Fe Ry.* v. *Ellis*, 165 U. S., 150, and quotes from the opinion by Mr. Justice Brewer, this sentence: "It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the XIV Amendment, and in all cases it must appear not only that a classification has been made but also that it is one based upon some reasonable ground, some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection." In that case the court passed upon an Act of the Legislature of the State of Texas, which provided that any person having certain valid claims against any railway company pursuing the method prescribed in the statute as to presentation and demand, should upon finally establishing his claim be entitled to recover, "in addition thereto all reasonable attorney's fees, provided he has an attorney employed in his case, not to exceed $10, to be assessed and awarded by the court or jury trying the issue." Mr. Justice Brewer in delivering the opinion of the court declaring against the constitutionality of the statute, said further:

"Considered as such" (as a whole) "it is simply a statute imposing a penalty upon railroad corporations for a failure to pay certain debts. No individuals are thus punished, and no other corporations. The act singles out a certain class of debtors and punishes them when for like delinquencies it punishes no others. They are not treated as other debtors, or equally with other debtors. They cannot appeal to the courts as other litigants under like conditions and with like protection. If litigation terminates adversely to them, they are mulcted in the attorney's fees of the successful plaintiff; if it terminates in their favor, they recover no attorney's fees. It is no sufficient answer to say that they are punished only when adjudged to be in the wrong. They do not enter the courts upon equal terms. They must pay attorney's fees if wrong; they do not recover any if right; while their adversaries recover if right, and

pay nothing if wrong. In the suits, therefore, to which they are parties, they are discriminated against, and are not treated as others. They do not stand equal before the law. They do not receive its equal protection. All this is obvious from a mere inspection of the statute."

Enough has been quoted to demonstrate that *Gulf, Colorado & S. Fe Ry.* v. *Ellis,* supra is not in point, but is in entire harmony with the cases following, which support the contention of the plaintiff, that the State in the exercise of its police power may enact such laws for the safety and protection of its citizens as the circumstances and necessities of a particular class may require without violating any constitutional guaranty.

*State* v. *Montgomery,* 94 Maine, 192; *Pierce* v. *Kimball,* 9 Maine, 54; *Holden* v. *Hardy,* 169 U. S., 366, 392; *Leavitt* v. *Canadian Pacific Railway Company,* 90 Maine, 153; *State* v. *Mayo,* 106 Maine, 62; *State* v. *Phillips,* 107 Maine, 249.

"The specific regulations for one kind of business which may be necessary for the protection of the public, can never be the just ground of complaint because like restrictions are not imposed upon other business of a different kind. The discriminations which are open to objection are those where persons engaged in the same business are subject to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the laws." *Soon Hing* v. *Crowley,* 113 U. S., 703; *Barbier* v. *Connolly,* 113 U. S., 27.

A state may classify the objects of legislation so long as its attempted classification is not clearly arbitrary and unreasonable. *Clark* v. *Kansas City,* 176 U. S., 114, 20 Sup. Ct. Rep., 284, affirming 59 Kan., 427, 53 Pacific, 468.

And so the Federal Supreme Court has held that the test is that the statute be general, embracing all persons under substantially like circumstances, and not an arbitrary exercise of power. *Deleware, L. & W. R. Co.* v. *Board of Public Utilities Commission,* New Jersey Supreme Court, 84 Atl. Rep., 704, citing among other cases *Lowe* v. *Kansas,* 163 U. S., 81; *Duncan* v. *Missouri,* 152 U. S., 337; *Hayes* v. *Missouri,* 120 U. S., 68. See *Garrett* v. *Turner,* Pennsylvania Supreme Court, 84 Atl. Rep., 354, a case involving the

constitutionality of a statute providing that "in actions for damages against the owners of automobiles for injuries sustained in the operation thereof, service may be had in another county than that where the accident occurred, and the suit is brought is not objectionable for inequality, since persons who own automobiles form a proper basis for classification."

In *Dartmouth College* v. *Woodward,* 17 U. S., 4 Wheat., 629, Chief Justice Marshall, in delivering the opinion of the court, said: "that in no doubtful case would it (the court) pronounce a legislative act to be contrary to the Constitution." In the Sinking Fund cases the court said: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." 99 U. S., 700, 25 L. ed., 496, *Powell* v. *Pennsylvania,* 127 U. S., 678. Lunt's Case, 6 Maine, 412.

In *Leavitt* v. *Canadian Pacific Railway Co.,* 90 Maine, 153, this court in passing upon an amendment involving a question under the equality clause of the Fourteenth Amendment, said: "This clause merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."

The Fourteenth Amendment does not take from the states police powers reserved to them at the time of the adoption of the Constitution. See Slaughter House Cases, 16 Wall., 36; *Barbier* v. *Connolly,* 113 U. S., 27; *Mugler* v. *Kansas,* 123 U. S., 623; Cooley's Cons't. Limitations, 7th ed., 11. "It is sufficient for us to have pointed out that, in addition to the power to punish felonies and misdemeanors, the state has also the authority to make extensive and varied regulations as to the time, mode, and circumstances in and under which parties shall assert, enjoy, or exercise their rights without coming in conflict with any of those constitutional principles which are established for the protection of private rights, or private property." Cooley's Cons't. Lim., 890, and cases cited, including *Pierce* v. *Kimball,* 9 Maine, 54 supra. See also *Minneapolis Railway Co.* v. *Beckwith,* 129 U. S., 26, 29.

A state, under its police power, has the same power to provide for the public safety and convenience as to protect the public health and morals. A state cannot divest itself of its right and duty in respect to full exercise of the police power. *Sabre* v. *Rutland R. Co.*, Supreme Court of Vermont, January 21, 1913, 85 Atl. Rep., 693.

In *Holden* v. *Hardy*, 169 U. S., 366, the court had under consideration a statute limiting hours of labor in certain mines to eight hours a day except in cases of emergency when life or property is in imminent danger, and the court say, "the cases arising under the Fourteenth Amendment are examined in detail and are held to demonstrate that, in passing upon the validity of State legislation under it, this court has not failed to recognize the fact that the law is, to a certain extent, a progressive science; that in some states methods of procedure which, at the time the Constitution was adopted, were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals or classes had proved detrimental to their interests; and other classes of persons, particularly those engaged in dangerous or unhealthy employments, have been found to be in need of additional protection.

The opinion quotes similar views expressed in *Missouri* v. *Lewis*, 101 U. S., 23, 31. The same subject was elaborately discussed by Mr. Justice Matthews, delivering the opinion in *Hurtado* v. *California*, 110 U. S., 516, who said, among other things: "This flexibility and capacity for growth or adaptation is the peculiar boast and excellence of the common law. . . . The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues." Again; "In states where manufacturing is carried on to a large extent, provision is made for the protection of dangerous machinery against accidental contact, for the cleanliness and ventilation of working rooms, and for the guarding of well-holes, stairways, elevator shafts, and for the employment of sanitary appliances." The court, in further alluding to the statutes relating

to such protection, say, "these statutes have been repeatedly enforced by the courts of the several states; their validity assumed, and, so far as we are informed, they have been uniformly held to be constitutional."

In *State* v. *Mayo,* 106 Maine, 63, this court has held: "It is a fundamental law that no constitutional guaranty is violated by an exercise of the police power of the State when manifestly necessary and tending to secure general and public benefits." A law is not to be regarded as class legislation simply because it affects one class and not another, provided it affects all members of that same class alike, and the classification involved is founded upon a reasonable basis. Such a law is general and not special.

When the Legislature has constitutional authority to enact a law to promote the public safety, and does enact it, the expediency of its enactment is not to be passed upon by the court. In such case the Legislature determines by the enactment that the law is reasonable and necessary." See *Lowe* v. *Kansas,* 163 U. S., 81, 88; *Duncan* v. *Missouri,* 152 U. S., 377; *Moor* v. *Veazie,* 32 Maine, page 360; *Jacobson* v. *Massachusetts,* 197 U. S., page 11.

In *State* v. *Mitchell,* 97 Maine, 66, cited by the defendant as bearing upon the case at bar, where the court passed upon the Hawkers' and Peddlers' Act, Laws of 1901, there was sought to be made a discrimination between those who own and pay taxes on a stock in trade to the amount of $25.00, and those who pay a less tax on their stock in trade (exempting the former from paying license fees, while requiring the latter to pay them); and there the court held, that it was a mere arbitrary discrimination, not based on any inherent difference in kind, and offends against that equality of right established by the fundamental law." The court added: "The scope of the clause cited from the 14th Amendment, that 'No State shall deny any person within its jurisdiction the equal protection of the laws,' has often been considered by the Federal and State courts, and more or less conflict of opinion has developed. . . . No one now questions that these constitutional provisions prevent a state making discriminations as to their legal rights and duties between persons on account of their nativity, their ancestry, their race, their creed, their previous condition, their color of skin, or eyes, or hair, their height, weight, physical or mental strength,

their wealth or poverty, or other personal characteristics or attributes, or the amount of business they do.   It must be conceded, on the other hand, that these constitutional provisions do not prevent a state from diversifying its legislation or other action to meet diversities in situations and conditions within its borders.   There is no inhibition against a state making different regulations in different localities, for different kinds of business and occupations, for different rates and modes of taxation upon different kinds of occupations, and generally for different matters affecting differently the welfare of the people.   See *Leavitt* v. *Canadian Pacific Railway Co.,* 90 Maine, 153, 38 L. R. A., 152, for a full and clear exposition of this doctrine."

The business of cutting, hauling and driving logs, differs in kind from the business here in question.   Defendant's business is a pulp and paper business with electricity as a motive power, and the use of electricity for power purposes introduced an entirely new element of danger for all persons employed where such power is used. While there has been development in the manner of hauling and driving logs by introducing power and power appliances in moving them, the appliances and power are well known and their dangers obvious.   The lumber business is as old as our government, and many of its features are familiar to employees before entering therein.   There has been no radical change of detail to authorize a change of classification.   The pulp and paper business is a new business.   Electricity for power purposes has been introduced therein, making necessary certain regulations as to its use, which must be new, and which are in no way similar to the lumber business in any of its forms or detail as known and conducted before the introduction of electricity for power purposes, or the making of paper by present methods.   We are living in a time of profound changes, socially and in the mechanic arts.   Science has improved old methods and has created new, has discovered and set in motion new energies, and perfected mechanical appliances to meet the requirements of new forces now being used to supply the imperative demands of industrial expansion.   There has been a revolution in business and business methods since the adoption of the Fourteenth Amendment.   The legislators adopting that amendment represented thirty million people, and had in view the then known and under-

stood trades and occupations to be affected by the equality clause of that amendment. They did not foresee, nor could they have had in contemplation, the marvellous changes to be made in the forces and appliances then in use to those now in use, answering the requirements of nearly one hundred million people.

It is the opinion of the court that Chapter 258 of the Public Laws of 1909, approved April 2, 1909, entitled "An Act relating to the Employment of Labor," is a valid exercise of the police power of the State, and it is therefore, not repugnant to, or in conflict with, the Constitution of the United States or the Constitution of the State of Maine.

The refusal to instruct the jury to return a verdict for the defendant was correct.

The entry will be,

*Motion and exceptions overruled.*