## STATE v. HALL

(No. 985; Decided January 6, 1920; 194 Pac. 476)

CRIMINAL LAW—PROSECUTOR'S EXCEPTIONS—ANIMALS—CONSTITUTIONAL LAW—SHEEP DIPPING STATUTE—JUDICIAL NOTICE NOT TAKEN THAT ANNUAL DIPPING OF SHEEP IS USEFUL—STATUTE REQUIRING ANNUAL DIPPING OF SHEEP CONSTITUTIONAL—EMINENT DOMAIN—POLICE POWER—STATUTES—AMENDATORY STATUTE WITHIN TITLE—INDICTMENT AND- INFORMATION—OBJECTION PROPERLY RAISED BY DEMURRER—IMPOSSIBLITY OF PROCURING SUPERVISION AS DEFENSE AGAINST PROSECUTION FOR FAILURE TO DIP SHEEP—PENAL

STATUTES STRICTLY CONSTRUED—REMEDY FOR INCONSISTENCY BE-
    TWEEN COUNTS IS BY ELECTION.

1. In a criminal prosecution where the lower court sustained
   a demurrer to the information on the grounds that the
   facts stated did not constitute an offense and that the
   statutes on which prosecution was based were unconsti-
   tutional, and where there were several other cases involv-
   ing the same questions pending, it was proper for Su-
   preme Court to consider such questions on a bill of excep-
   tions filed by the prosecuting attorney under Comp. St.
   1910, §§ 6244, 6245.

2. Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107,
   § 3, as re-enacted and amended by Laws 1917, c. 80, §
   1, providing for the compulsory dipping of all sheep kept
   or herded within the state, whether diseased or not, done
   under the supervision of an inspector and regulations
   of the state board, enacted under Const. art 9, § 1, author-
   izing legislation for the protection of live stock, *held* a
   proper exercise of the police power, and not arbitrary in
   violation of article 1, §§ 7, 15, nor invalid as reposing ju-
   dicial powers in an administrative officer contrary to ar-
   ticle 5, § 1.

3. In a criminal prosecution involving constitutionality of
   statutes requiring annual dipping of all sheep, *held*, that
   court will not take judicial notice that as a well-known
   scientific fact a single annual dipping of sheep is use-
   less for the purpose of eradicating or preventing infec-
   tious diseases.

4. Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107,
   § 3, as re-enacted and amended by Laws 1917, c. 80, § 1,
   requiring all sheep within state to be annually dipped,
   *held* not to deny to sheep owners the equal protection of
   the laws, being applicable alike to all sheep owners and
   all sheep within the state.

5. Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107,
   § 3, as re-enacted and amended by Laws 1917, c. 80, §
   1, requiring all sheep within state to be annually dipped,
   *held* not to take private property without due process of
   law in violation of Const. U. S. Amend. 14, and Const.
   Wyo. art. 1, § 6, or without compensation therefor, under
   section 33.

6. Const. U. S. Amend. 14, does not impair in any way the
   police power of the states nor limit the subjects in rela-
   tion to which it may be exercised for the protection of
   its citizens.

7. If Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107, § 3, as amended and re-enacted by Laws 1917, c. 80, § 1, requiring sheep to be annually dipped at a specified time of the year, making owner's failure to do so a misdemeanor, authorizing state board of sheep commissioners to dip the sheep on owner's failure to do so and providing for a lien on sheep dipped by the board for the expenses thereof, is invalid as to such lien, it would not affect other provisions.

8. Laws 1917, c. 80, § 1, entitled "An act to amend and re-enact Section 3, Chapter 107, Session Laws 1915," requiring owner or controller of all sheep within the state to annually dip sheep at a specified time of year and furnish affidavit thereof making failure to do so a misdemeanor and empowering state board of sheep commissioners to dip the sheep at owner's expense on owner's failure to so do, *held* not violative of Const. art. 3, § 24, requiring subject of a bill to be expressed in its title, since the subject-matter of such statute might properly have been included in the amended act of 1915 under its title of "An act to amend and re-enact Sections 2684, 2685, and 2691 of Chapter 178, Wyoming Compiled Statutes, 1910, relating to the board of sheep commissioners," as well as under the title of Laws 1909, c. 60, § 10, amended by such act of 1915, and since the law of 1917 as the bill was introduced and as it was printed in the House Journal referred in its title to the original statute and amended by such law of 1915, but without any one being misled, was amended so as to omit such reference as printed in the session laws.

9. In prosecution for violation of Comp. St. 1910,§ 2691, amended by Laws 1915, c. 107, § 3, as amended and re-enacted by Laws 1917, c. 80, § 1, requiring owner or controller of sheep to have sheep annually dipped, objection that information alleged in the disjunctive that "owner, or controller" failed to dip sheep should have been raised by motion to quash and not by demurrer under Comp. St. 1910, §§ 6186-6190.

10. On prosecuting attorney's exceptions to rulings of court in criminal case under Comp. St. 1910, §§ 6242-6245, the only proper record is the bill of exceptions of the prosecuting attorney.

11. In a prosecution for failure to dip sheep in dip recommended by state board of sheep commissioners as required by Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107,

§ 3, as amended and re-enacted by Laws 1917, c. 80, § 1, failure of information to allege that the dip was recommended by the board of sheep commissioners *held* fatal.

12. In a prosecution for failure to dip sheep under the supervision of an authorized sheep inspector as required by Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107, § 3, as amended and re-enacted by Laws 1917, c. 80, § 1, the defendant may show as a matter of defense that it was impossible to procure the supervision of such an inspector.

13. Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107, § 3, as amended and re-enacted by Laws 1917, c. 80, § 1, requiring all sheep in state to be annually dipped between stated dates and requiring owner or controller of sheep to file affidavits as to such dipping, *held* to impose a duty of dipping on the owner or controller.

14. Penal statutes are to be strictly construed.

15. In prosecution for failure to file affidavit as to dipping of sheep under Comp. St. 1910, § 2691, as amended by Laws 1915, c. 107, § 3, as amended and re-enacted by Laws 1917, c. 80, § 1, information that defendant, being the owner or controller of sheep herded or kept within the state, unlawfully and knowingly failed to file an affidavit setting out the fact that his sheep had been dipped without alleging th'at defendant's sheep had been dipped, *held* defective.

16. The proper remedy for inconsistency between two counts is to require prosecuting attorney to elect, and not a demurrer.

EXCEPTIONS from District Court, Natrona County, CHARLES E. WINTER, Judge.

T. A. Hall was informed against for violation of statutes as to dipping of sheep. Demurrer to the information was sustained and defendant discharged. The prosecuting attorney brings the case to the Supreme Court on exceptions to rulings in the case. Questions answered.

*W. L. Walls, Attorney General,* for the Exceptions.

The prosecution was brought under Section 2691, C. S. 1910 as amended by Section 3, Chapter 107, Laws 1915, and Chapter 80, Laws 1917, relating to the dipping of sheep for the suppression or prevention of contagious or infec-

tious diseases. The defendant demurred to the information generally, and also enumerated specific grounds challenging the constitutionality of the statute; the demurrer was sustained and defendant discharged, whereupon the prosecutor brought the case here on exceptions to rulings of the trial court. A reading of the statute shows that the information followed its provisions, and is not an offense under the laws of the state. Penal statutes while strictly construed, should receive a common sense construction. (Sutherland St. Con. Vol. 11, 980). It is contended that the statute violates Art. 1, Section 6 of the constitution as to due process of law. The provisions of the statute are within the police power of the state. (Hamp v. State, 19 Wyo. 377). The constitution expressly provides for laws protecting live stock, Sec. 1, Art. XIX. The statute is in the nature of a police power to protect all sheep and to prevent disease, and as such is not repugnant to the quoted provision of the constitution. (6. R. C. L. 226). The legislature is the judge acting within the constitution as to the exercise of police power, (6 R. C. L. 230.) Police regulations are valid even though they interfere with property rights. (6 R. C. L. 192). The statute does not delegate judicial power, but is an administrative police regulation. The fourteenth amendment to the constitution recognizes the proper exercise of the police power of the state. The amendments made to the original statute are within the original title and do not violate Art. I, Sec. 24 which provided for the appointment of a board of sheep commissioners, their compensation, powers and duties. The titles to the amendatory acts are in the same language and the several amendments themselves related to the subject of the original title, and might have been properly included in the original act since the constitutional requirement as to title is satisfied, (Lewis' Sutherland St. Con. Vol. 1, 231). As the act of 1917 does not extend the scope of the original act beyond the purview of the title, and the same can be said of the prior amendatory act. The prescribed penalty is not oppressive. The

annual dipping requirement is not unreasonable. The statute is clearly within the mandate of Art XIX, Sec. 1, of the constitution, directing legislation for the protection of live stock against infectious and contagious disease.

*Hagens, Stanley and Murane,* for Defendant in Error.

Defendant below first moved to quash the information, which motion was overruled; defendant thereupon demurred upon seven specific grounds, which demurrer was sustained. The statute does not require the owners to dip sheep, hence, he cannot make the required affidavit nor avoid the penalty; it is arbitrary in its provisions. (Richter v. State, 16 Wyo. 443; Bishop St. Crs. 220). Construction cannot supply provisions necessary to give the statute validity. The statute makes the inspector judge, jury and executioner and unless he can verify the acts of inspector or procure supervision of inspector in the dipping, he is subject to a fine of $2,000 or incarceration in jail; the appropriation of a man's property without notice is a violation of constitutional right. (Stirrett v. Young, 82 Pac. 946; Cooley's Con. Lim. 6th Ed. 431 C. B. & Q. Railroad Co. v. Chicago, 166 U. S. 236; Yick Wo. v. Hopkins, 118 U. S. 30 Ed. 225). The fourth and sixth grounds of demurrer may be considered together and in this connection we cite Gillespie v. People, 58 N. E. 1009. Judicial powers are vested in the board of sheep commissioners with authority to impose a lien upon private property for the cost of dipping and sale. (Western Union Tel. Co. v. Myatt, 98 Fed. 347). There is no occasion for invoking police power against a business that is not a nuisance and not dangerous to health, morals or the property rights of others. (Gillespie v. People, supra; Town of Greensboro v. Ehrenreich, 2 So. 725; Health Dept. v. Rector, 39 N. E. 835). Any person is at liberty to pursue any lawful calling in his own way that does not infringe the rights of others. (Dennis v. Moses, 52 Pac. 333; Ex Parte Whitewell, 98 Cal. 73; 32 Pac. 870; State v. Schlenker, 84 N. W. 698). The original act may be justified as a proper exercise of police power that

had dealt with scabby or infected sheep; the amendment deals with clean sheep and requires all sheep to be dipped. A single dipping is not a preventative of disease. This is a matter of scientific knowledge, of which the court will take judicial notice. A statute requiring healthy sheep to be dipped twice annually was condemned by the Oregon court; (Adams v. Lytle, 154 Fed. 876). The information does not allege that defendant kept sheep in Natrona County which he failed to dip, and does not charge an offense in Natrona County; (Commonwealth v. Ill. Cent. R. R. Co., 90 S. W. 273). The statute is invalid as an enlargement of the scope of the original act; this is disclosed by an examination of the successful amendments upon which it is based. (Cooley Con. 6th Ed. 170; B. & N. R. R. Company v. Commissioners, 4 N. W. 240; Eaton v. Walker, 43 N. W. 638; Webster v. Powell, 18 So. 441; Kedzie v. Ewington, 55 N. W. 864; People v. DeBlaay, 100 N. W. 598; Armstrong v. Mayer, 83 N. W. 401; Union Pacific Railroad Company v. Sprague, 95 N. W. 46; Preston v. Stover, 97 N. W. 812; State ex rel Graham v. Tibbets, 71 N. W. 990; Commissioners v. Stone, 7 Wyo. 280).

POTTER, Chief Justice.

This is a criminal case and is here upon a bill of exceptions filed by the prosecuting attorney, with the permission of the court, under the provisions of sections 6242-6245 Compiled Statutes, 1910. The questions presented by the bill for the decision of this court arose in the district court upon a demurrer to the information, which was sustained and resulted in the discharge of the defendant. The principal question raised by the demurrer and presented here is the constitutionality of the statute upon which the prosecution was based, but the sufficiency of the information is challenged also upon other grounds.

The cause was prosecuted in Natrona county, and the information filed in the district court for that county contains two counts charging or intended to charge violations.

of certain provisions in the statute relating to the prevention and suppression of scab or scabies and other contagious and infectious diseases among sheep. The particular provisions forming the basis for the prosecution and involved in the questions here presented are found in section 1 of chapter 80, Laws of 1917, amending and re-enacting section 3 of chapter 107, Laws of 1915, which amended and re-enacted section 2691, Compiled Statutes 1910, and read as follows:

"All sheep which are kept or herded within the limits of the State of Wyoming, shall, between the fifteenth day of April and the first day of November of each year, be dipped under the supervision of an authorized sheep inspector in one of the dips which have been recommended by the State Board of Sheep Commissioners, said dip to be used at a strength sufficient to eradicate scabies. The owner or controller of said sheep so dipped, shall, within twenty days after the completion of such dipping file with the authorized sheep inspector or the State Board of Sheep' Commissioners the affidavit of two persons who were present and assisted in said dipping, which affidavit shall state the number of sheep or bucks dipped, kind of dip used, and the manner, time and place of such dipping. The per diem and expenses of the inspector to be paid by the owner or controller of the sheep so dipped. * * * Any person who is the owner or controller of any sheep within the State of Wyoming violating the provisions of this section, shall be guilty of a misdemeanor and shall be subject to a fine of not more than two thousand dollars ($2000.00)."

. It is also provided by the section immediately following the above quoted provision for the payment of the inspector's per diem and expenses and immediately preceding the penal provision, as follows:

"The State Board of Sheep Commissioners is hereby authorized and empowered to take charge of and dip as

soon as possible after the first day of November of each year, all sheep kept or herded within the limits of the State of Wyoming, not previously dipped within the period required by this section, and all the expenses for so doing, including the per diem and expenses of an authorized sheep inspector, shall be paid by the owner of said sheep and the same shall become and be a lien upon such sheep until paid and shall be collected within the time and in the manner heretofore provided in this section for the collection of the expenses and per diem of such inspector incurred in the dipping or treating of diseased or tick-infested sheep. All loss or damage which results from the enforcement of this section is to be paid by the owner of the sheep. The State Board of Sheep Commissioners is hereby authorized and empowered to make such rules and regulations as they deem necessary relative to the administration of this section.''

The above quoted provisions include all the changes made in the section by the Act of 1917. The section as originally enacted in 1909 (Laws 1909, Ch. 60, Sec. 10) and incorporated in the Compiled Statutes of 1910 as section 2691 contained none of these provisions, but as amended and re-enacted in 1915 it contained a provision requiring all sheep in the state to be dipped between the 15th day of April and the 30th day of November of each year with one of the dips recognized by the Bureau of Animal Industry, and a provision prescribing a penalty to be imposed upon the owner of any sheep in the state violating the provisions of the ''paragraph'' which, as published, comprised the whole section. The remainder of the section as originally enacted and as since amended and re-enacted provides for the quarantine and treatment, including dipping, of sheep found to be infected with scab or any other contagious or infectious disease detrimental to sheep or that have been exposed to any such disease.

The leading purpose or general subject of the original Act, as shown by its title and provisions, was the prevention and suppression of scab and other contagious and infectious diseases among sheep. And to that end it contained provisions, specially indicated by its title, for the appointment of sheep inspectors and a Board of Sheep Commissioners, for the acceptance by said Board of the rules and regulations prepared under section 3 of the Act of Congress approved May 29, 1884, establishing a Bureau of Animal Industry, and authorizing inspectors of said Bureau to inspect domestic animals infected with contagious or infectious diseases within this state. The several sections of the Act were incorporated in the Compilation of 1910 as chapter 178 and include the compilation sections 2682 to 2706 inclusive; said chapter being one of several under the general title of "Live Stock", each of said chapters having a separate sub-head or title inserted by the compiler, that of said chapter 178 being: "Board of Sheep Commissioners." Each section also is preceded by compiler's catch-words or phrases in black-faced type intended as some indication of the subject of the provisions thereof. Thus, following the number and preceding the provisions of section 2691 appear the words: "Duty of Inspector—Scab quarantine."

The information in this case charges in the first count that the defendant failed and neglected to dip his sheep between the 15th day of April and the first day of November of the year 1918; and in the second count that he failed and neglected in that year to file an affidavit showing that the sheep had been dipped. It is stated in the demurrer as grounds therefor, that the facts stated in the information do not constitute an offense punishable by the laws of the state, and that the statute upon which the information is based is unconstitutional, for the reason that it is repugnant to and in contravention of several provisions of the constitution of the state, specifically re-

ferred to, and the Fourteenth Amendment of the Constitution of the United States. The provisions of the state constitution alleged to have been contravened are: "No person shall be deprived of life, liberty or property without due process of law." (Art. 1, Sec. 6.) "Absolute arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." (Art. 1, Sec. 7.) "The penal code shall be framed on the humane principles of reformation and prevention." (Art. 1, Sec. 15.) "Private property shall not be taken or damaged for public or private use without just compensation." (Art. 1, Sec. 38.) "The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, justices of the peace, courts of arbitration, and such courts as the legislature may, by general law, establish for incorporated cities and incorporated towns." (Art. V, Sec. 1.) "No bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject is embraced in any act which is not expressed in the title, such act shall be void only as to so much therefor as shall not be so expressed." (Art. III, Sec. 24.) And by the closing paragraph of the demurrer it is charged generally, that the law upon which the prosecution is based is arbitrary, harsh and oppressive, and reposes unwarranted, arbitrary and judicial powers in an executive or administrative officer, and is not authorized or justified under the police power of the state.

The statute provides as to a case brought here upon exceptions by the prosecuting attorney that if, upon the presentation of the bill of exceptions, this court shall be of the opinion that the questions presented by the bill should be decided upon, the court shall allow the bill to be filed and render a decision thereon, and that the judg-

ment of the court in the case in which the bill is taken
shall not be reversed nor in any manner affected, but that
the decision of this court shall determine the law to gov-
ern in any similar case which may be pending at the time
the decision is rendered, or which may afterwards arise
in the state.    (Compiled Statutes 1910, Sections 6244,
6245.)  And 'we are informed by the briefs that several
other cases like the one at bar, and involving the same
questions, are pending, and that in this case, the district
court held the information to be insufficient under the
first ground stated in the demurrer, and also held the said
provisions of the statute for the annual dipping of all
sheep kept or herded in the state to be unconstitutional in
disposing of the other grounds of the demurrer.  We think
it proper therefore to consider and decide all the ques-
tions properly presented by the demurrer and the excep-
tion to the ruling thereon, and in this court by the bill of
exceptions and the brief in support thereof.

The constitutional questions will be first considered.
As shown by the brief and argument of counsel appointed
to argue the case here against the prosecuting attorney's
exceptions, the several objections to the statute upon con-
stitutional grounds relate to the provisions for the com-
pulsory annual dipping of all sheep kept or herded within
the state, and, with the exception of the objection that
the statute is repugnant to the provision of our state con-
stitution that no bill, with certain stated exceptions, shall
be passed containing more than one subject, which shall
be clearly expressed in its title, the several objections may
be considered together without restating the constitution-
al provisions upon which they are respectively based.   It
is contended generally in support of those objections that
the said provisions of the statute are unreasonable, and
therefore arbitrary and an improper exercise of the po-
lice power of the state.   This contention is based upon as-
sertions of counsel that the provisions aforesaid apply

to clean or healthy as well as diseased sheep or sheep known to have been exposed to scab or some other contagious or infectious disease detrimental to sheep, and cannot be considered even as a preventive measure because of the well-known scientific fact of which the court will take judicial notice, that a single dipping will not eradicate or prevent scab or tick or any other infectious disease of sheep mentioned in the statute.

Our discussion of this question will have reference particularly to the provisions requiring all sheep to be dipped each year, between April 15 and November 1, and that the board shall after November first take charge of and dip all sheep not previously dipped within the required period; our understanding of the provision for the board to "take charge" of such sheep being that the board is to take charge merely for the purpose of dipping.

It may be conceded that the challenged provisions of the statute do apply to all sheep kept or herded within the state, whether diseased or not, or, at least, whether or not they are known to be diseased or to have been exposed to any infectious disease detrimental to sheep. And it seems to be the intention of the statute to require the annual dipping of all such sheep, without first inspecting them to ascertain whether they are infected with any disease for which dipping is a proper treatment or inquiring whether they may have been exposed to any such disease. But we are unable to agree with the contention that the provisions are unreasonable as having no beneficial relation to the general purpose of the statute to suppress or prevent such diseases among sheep. For the theory upon which the argument against the reasonableness of such provisions is based, that, as a well-known scientific fact, a single annual dipping of sheep is useless for the purpose of eradicating or preventing scab or any other infectious disease of sheep, does not seem to be generally accepted by those possessing expert or scientific knowledge of the

subject, or by sheep-owners to such an extent as would justify the court in taking judicial notice of such asserted fact. On the contrary, the prevailing scientific and public opinion on the subject, so far as we have been able to ascertain, seems to be opposed to the aforesaid theory and sufficient to furnish a reasonable basis for the legislation. As early as 1898 Dr. Salmon, then chief of the United States Bureau of Animal Industry, and one of the leading scientists of his day in veterinary medicine, in submitting to the Secretary of Agriculture a discussion of "Sheep Scab; Its Nature and Treatment" for publication as a bulletin of the bureau, said, after explaining the serious and insidious nature of the disease: "If all of the sheep owners of the country would dip regularly and thoroughly, there is no reason why this scourge should not be totally eradicated from the United States. There should be stringent scab laws in every state, with state inspectors to see that those laws are carried out." And in the body of the bulletin, several references are made to the desirability under stated circumstances of dipping sheep "as a precautionary measure." (Bureau of Animal Industry Bulletin No. 21, 1898.) In 1903, as shown by the Government's Farmers' Bulletin No. 159, while Dr. Salmon was still chief of the Bureau, the statement above quoted was repeated; and it was further stated therein, as among the practical lessons to be drawn from expert investigation, that "if new sheep are placed in a flock, they should either be dipped as a precautionary measure" or at least be kept separate for several weeks to see whether scab develops. In Farmers' Bulletin No. 173, of date April 17, 1916, from the Bureau of Animal Industry, after stating the fact that much progress had been made in the eradication of the disease throughout the country, it was said:

"In view of the highly contagious nature of the disease, it is very important that the work of eradication be pushed to completion in order to prevent the disease from again be-

coming prevalent. &ast; &ast; &ast; As soon as the disease is re- duced to a point where the economic loss is little or nothing, many sheep owners lose sight of the importance of continu- ing systematic efforts for compete eradication. It is neces- sary, however, for the protection of the sheep industry that the efforts be continued until the pest is completely eradi- cated. Since the quarantine has been removed and compul- sory dipping discontinued the sheep owners in some commu- nities have allowed their dipping vats to go to ruin from lack of use and care. *All vats should be kept in repair, and for several years to come each sheep owner will probably find it wise to dip his sheep at least once a year as a precaution- ary measure.*"

In Farmers' Bulletin 798, published in May, 1917, by the Department of Agriculture, as a contribution from the Bureau of Animal Industry upon the subject of "Sheep Tick, and Its Eradication by Dipping" we find the follow- ing:

"For a number of years it has been the custom in the majority of the principal sheep-growing states to dip the flocks regularly for scab. Such dipping evidently checked the spread of sheep ticks also, but as scab has been eradicat- ed in many of the states compulsory general dipping for scab was discontinued in such areas, and especially in the Northwest. In the meantime the ticks spread rapidly and became prevalent in many of the flocks to such an extent that in some of the states compulsory general dipping was resumed in order to eradicate them. The sheep owners in some of the southwestern states have continued to dip their flocks more or less regularly each season and consequently the ticks are not so plentiful in those areas. However, they are gaining a foothold in many of the flocks in this section, and conditions indicate that they may become a source of considerable loss if dipping is discontinued before they are eradicated."

And in the most recent bulletin, No. 713, a revision of the bulletin of April 17, 1916, re-issued in May, 1920, we

find the statement quoted above from a former bulletin to the effect that for several years to come, each sheep owner will probably find it wise to dip his sheep at least once a year as a precautionary measure. We find therein also the statement that all bucks of public buck-herds "should be dipped just prior to the time the animals are to be distributed to the various owners," which, it is said, is "one of the most important points in eradicating scab from the flocks on the open ranges" where the custom of public buck-herds prevails. In the same bulletin, after stating that, as a basis of practice, it should be understood that one dipping will not cure scab, it is said further that "if the active principle of the dip used is only slightly volatile and the sheep have heavy fleeces, one dipping will sometimes effect a cure" for the reason that sufficient dip may remain in the wool to kill the new crop of mites, and, following a reference to the fact that after the disease in a flock has been cured by dipping the sheep may become re-infected upon coming in contact with infected sheep or places it is said:

"The dip that is left in the wool after dipping will often serve, for a limited period of time, as a preventative against reinfection. The length of this period of protection varies with the climatic conditions and the kind of dip used. If the sheep are exposed to frequent heavy rains after dipping, much of the dip will be washed out of the fleece. A dip containing sulphur acts as the best preventative against re-infection. Under average conditions such a dip will probably afford protection for a period of from 30 to 60 days and, under favorable conditions, for a much longer period."

In the bulletin upon the subject of sheep tick above referred to, it is said: "The first dipping probably destroys many of the pupae that are less than 4 days old, and the dip remaining in the wool has a tendency to prevent the development of young ticks and probably kills many of them." That a single dipping may be beneficial in the prevention and eradication of communicable diseases for which dipping is a proper treatment seems also to be recognized by the

regulation of the Department of Agriculture, dated April 23, 1918, and effective May 1, 1918, which provide, among other things, that sheep imported from Mexico *must be dipped at least once,* although found upon inspection to be free from scabies or other contagious diseases, and accompanied as required by the owner's affidavit stating that they have been in the district from which shipped for 6 days preceding the date of importation, that no contagious disease affecting sheep has existed among them or other sheep with which they have come in contact for 60 days last passed, and also an affidavit that the sheep have not passed through any district infected with contagious diseases affecting sheep and have not been exposed in any possible manner to any such disease; and that sheep not accompanied by the required affidavits shall be detained in quarantine for a specified time, and twice dipped. Thus, provision is made by the regulations for compulsory dipping at least once, although the sheep may appear upon inspection to be free from any contagious disease, and it is shown by the required affidavits that they have not been exposed to any such disease.

Other scientific authorities on this subject are not lacking, though we have had access to a few only. In a volume entitled "Sheep Management" by Kleinheinz, Assistant Professor of Animal Husbandry in the University of Wisconsin, published in 1918, we find this statement on page 98: "At least once a year the flock should be dipped in order to rid it from ticks and also from lice if the latter should be present. * * * Dipping the flock is strongly advised, not only for the purpose of killing ticks and lice, but also in order to promote the health of the skin and further the growth of the wool. For this reason, many sheep breeders dip each year, in spite of the fact that they know their flocks are free from vermin. Many even dip twice a year, in spring and in fall, because they realize the benefit derived therefrom. * * * As a rule, not many flocks are entirely free from ticks. * * * Eight to ten days after

shearing, all the ticks will have moved off from the old sheep onto the lambs and the lambs should be dipped to destroy them. It is preferable, however, to dip the entire flock if possible." And on page 100: "The writer does not understand why dipping is neglected by some sheep owners. It is impossible for sheep to make any progress when they are covered with ticks and lice which annoy them day and night. * * * Therefore, it is very unwise to let sheep suffer from such pests through failure to dip them at least once a year."

We quote also the following from "Productive Sheep Husbandry" by W. C. Coffey, Professor of Sheep Husbandry, University of Illinois, published in 1918: "Ticks * * * are such common pests that flock owners are many times not aware of the amount of injury they do. By consistently following the practice of dipping it is possible to eradicate them, and there is no good excuse for having them in the flock. The whole flock should be dipped shortly after the shearing has been completed." Page 307. "Scab has been eradicated from most sections of the United States. By enforcing dipping and quarantine, the U. S. Bureau of Animal Industry has done a splendid piece of work in cleaning up the flocks of the western states." Page 309. "Before going to the summer range all sheep and lambs should be dipped in order to prevent the scattering of infectious skin diseases." Page 419. And it is to be remembered in this connection that the object of our statute is to eradicate and prevent ticks as well as scabies.

Many of the states, including Wyoming and most if not all of the other western states, have, by statute or otherwise, assented to the co-operation of the U. S. Bureau of Animal Industry, its officials and inspectors, for the suppression of contagious and infectious diseases among domestic animals in the state, as provided by the Act of Congress establishing said bureau. (See Act of Congress of May 24, 1884—Chapter 60, 23 Stat. L., 21, 32). And the information promulgated by that bureau upon the subject of sheep scab and

other contagious diseases of sheep is found reflected not only in the provisions of our statute but in similar provisions of the statutes enacted on the same subject in several other western states where the business of sheep raising is conducted under conditions quite like those in this state. A compulsory annual dipping provision is found in the statutes of Washington, Oregon, Nevada and New Mexico.

The Washington statute provides that whenever necessary by reason of the prevalence or exposure of scabies, ''of the sheep of any county or counties in the state, the State Veterinarian shall have full authority to issue an order compelling the dipping of all sheep in such districts or localities, whether all the sheep at the time being affected with or exposed to scabies or not.'' (Washington Laws 1909, Ch. 189). The Oregon statute provides that all sheep within the state ''shall be dipped at least once during each year with some standard dip approved as a remedy for scab or scabies, as a preventative of such disease, by the U. S. Department of Agriculture, whether the same are at the time diseased or not, and in case of diseased sheep, the same shall be dipped as often as required by the State Sheep Inspector, his deputies, or the officials of the U. S. government bureau of animal industry.'' And the period between April 1st and August 1st of each year is fixed by the statute as the time for the annual dipping. The statute also provides that if the owner or person in charge shall neglect or refuse to dip as required, upon the request of any inspector or federal official clothed with power under the act, or to permit the same to be dipped by them, then it shall be the duty of such official to seize the animals and dip them; provision being made also for the collection of the expenses incurred thereby. (3 Lord's Ore. Laws, Sections 5686-5691).

The Nevada statute requires the dipping of all sheep kept or herded within the state between April 15 and November 1 of each year under the supervision of an authorized sheep inspector in one of the dips recommended by the board, and of strength sufficient to eradicate scabies, ticks or lice.

(Nevada Stats. 1919, c. 32, p. 134. Ex Parte Goddard, 190 Pac. 916). The provision of the New Mexico statute reads: "All sheep in the state must be dipped at least once in each year in accordance with the rules and regulations established by the board." (N. Mex. Stat. 1915, Sec. 189). A statute has recently been enacted in Idaho which authorizes the state bureau established thereby or any inspector of the U. S. bureau of animal industry to require sheep owners to apply such remedies, dips or other curative agents as may be deemed necessary to prevent the introduction or dissemination of diseases among sheep or to effect a cure of infected sheep. (Ida. Sess. L. 1919, Ch. 35, Sec. 22.).

The fact that a provision for the compulsory annual dipping of all sheep is found in the statutes of so many of the western states, and in others a provision authorizing a rule or order to that effect, seems to be explainable only upon the theory that a belief in the efficacy of such dipping as a substantial aid in carrying out the general purpose of the statute, prevails among sheep owners and others interested in the prevention and suppression of the above mentioned diseases of sheep. The court would certainly not be justified in assuming that such provision adopted in so many states has been intended merely as an arbitrary measure, or enacted as a part of the statutes regardless of its probable result as a curative or preventive remedy. But we are not without public information as to the opinion prevailing in this state, for we find the matter referred to in several of the reports made to the Governor by the board of sheep commissioners, a board composed at all times of some of the leading sheep owners of the state. We quote the following from the report dated December 28, 1904:

"A large force of government inspectors was placed in the state and acted in conjunction with our own state inspectors in carrying out the rules and regulations of this board having for their object the complete eradication of scabies. Much opposition was encountered at first, but when the aims of the board became thoroughly known, the

sheepmen with few exceptions assisted in doing everything
possible to aid the commissioners and to eradicate disease.
During the year 1903 wholesale dipping of sheep was inau-
gurated, diseased sheep being put through the vats two and
three times, and clean or exposed sheep at least once. The
result, in the main, was satisfactory, for where there had
been 70 per cent of the bands scabby in the spring of 1903.
there were less than 20 per cent affected the following
spring. And again last spring dipping was resumed with
the result that today the state is practically clean and free-
·from scabies. There are some isolated cases, but with prop-
er vigilance and treatment, we believe the contagion can
be kept within bounds.   *   *   *   During 1903 there were
no less than 4,000,000 sheep dipped.   *   *   *   During the
season just closed, 2,500,388 sheep were put through the·
dipping vats once, and 701,985 scabby sheep, or sheep in
bands in which scabies had appeared, were dipped twice.''

The opinion of the board was expressed in its report of
1908 to the effect that the statute should be amended so as.
to deal with the tick pest, ''which is rapidly becoming a
menace to the successful conduct of the sheep industry in
this region.'' The report of 1910 contains the following,
after mentioning the fact of the existence of scabies in dif-
ferent parts of the state: ''*It is significant that nearly
all if not all of these outbreaks have occurred among sheep
that have not been dipped this year, and some of them pos-
sibly not for several years. A large majority of sheepmen
dip all of their flocks once each year, and a general dipping
of all of the sheep in the state once during each year would
without doubt go far towards keeping the flocks of Wyo-
ming in a healthy condition.*''

· The report of 1912 shows a general dipping order for the
eradication of ticks,·providing for the dipping of all sheep
outside of the areas quarantined for scab; that such order
had met with practically no opposition except in the north-
western part of the state and in two counties in other parts
of the state; that the sentiment and opinions expressed by

the flockmasters had been gratifying, several of the largest
·owners realizing the benefits derived from the eradication
of the tick pest from their herds, and having decided to
make dipping an annual custom. It is stated in the report
·of 1914: ''The successful sheepmen of this state realize
the advantages of dipping for ticks. Some of their neigh-
bors failed to realize these advantages. The law which we
have to work under at this time is inadequate to enforce the
general dipping order. As a result the men who dip are
unable in the large majority of instances to reap the bene-
fits derived· from dipping their sheep. * * * Many. of
·our sheepmen refused to comply with this order, and as
there was no penalty for the violation of the same, the board
was unable to protect those who did comply. During the
:spring and summer just passed many requests were made
to the board for a general dipping order for ticks. But
from the experience with order No. 38, the board did not
·think the results under the present law would justify the
expenditure of money which a general dipping order would
necessitate.'' And a law was recommended providing a
penalty for violating general dipping orders of the board.
Following that report came the amendment of the statute
in 1915, by. including a provision requiring all sheep with-
in the state to be dipped each year and prescribing a pen-
alty for violating such provision, which was in turn fol-
lowed by the act of 1917 here under consideration, retain-
ing the provision for dipping, adding provisions to enforce
the same, and changing the amount and form of the pen-
·alty. In the last report of the board, dated December 1,
1919, it is stated: ''The ·annual dipping law has been very
thoroughly discussed, both by the board and a great major-
ity of sheepmen over the state, and they believe that it is a
·benefit as well as a protective measure against an outbreak
of any disease, and that everyone should comply for their
·own benefit.''

So far as the reported decisions show that a provision for
·compulsory dipping of all sheep has come before the courts

.for consideration as to its validity, the contention that it is unreasonable, arbitrary and invalid has not been sustained. But the provision has been upheld as a proper exercise of the police power of the state. (Adams & Bryson v. Lytle, 154 Fed. 876, Ex Parte Goddard (Nev.) 190 Pac. 916). And that is true also of similar or analagous provisions of the statutes of some of the southern states providing for the eradication of the fever tick and other communicable diseases of cattle. (Brazeale v. Strength, (Tex. Civ. App.) 196 S. W. 247; Walker v. State, (Tex. Cr. App.) 222 S. W. 569; McMillan v. Live Stock Sanitary Board, 119 Miss. 500, 81 So. 169; Whitaker v. Parsons, (Fla.) 86 So. 247; Bishop v. State, 122 Tenn. 729, 127 S. W. 698).

The case of Adams & Bryson v. Lytle, supra, is cited by counsel in support of the contention that the statutory provision in question is unreasonable and invalid. But it does not support that contention. It involved a consideration of the Oregon statute in a suit by the owners of sheep being driven into Oregon from Washington to restrain the Oregon board of sheep commissioners and certain inspectors of that state from interfering with the driving of said sheep across the line into Oregon and pasturing them therein. And they challenged as unreasonable a rule of the board with reference to dipping which will presently be stated. In disposing of the case, the court recited the several provisions of the Oregon statute, including the provision requiring all sheep in the state to be dipped at least once each year, and a further provision requiring any person, firm or corporation who shall drive or herd, or cause to be driven or herded, or cause to be brought by road or trail into Oregon, any sheep, shall immediately upon crossing the line and before proceeding a greater distance than one mile into the state, make written application to the State sheep inspector or his nearest deputy for an inspection of said sheep, and that the inspector, on receiving such notice, shall either by himself or his deputy, inspect the sheep, and if upon inspection he shall deem it necessary to prevent or avoid infection,

shall cause said sheep to be dipped not to exceed three times before they are released from such quarantine. Thereupon, and referring to the recited provisions, the court said: · "I am not disposed to question the reasonableness of any of the provisions above noticed of the act under review. Manifestly, the legislature designed to have the law very perfect and rigid in all of its details, with a view to the prevention and eradication of diseases among sheep in the state of Oregon." The court then refers to the rule complained of, which made it the imperative duty of the sheep inspector upon receiving the notice given by parties bringing sheep into the state, to "proceed to inspect, to dip once within six days, then to quarantine for a period of from 8 to 14 days, and to dip again in the meanwhile." That, the court said, is to be done whatever may be the result of the inspection, whether the inspection finds the sheep healthy or otherwise, and whether they have in any way been exposed or not, or whether they come from any infected territory or not; and by the enforcement of the rule, the burden of twice dipping perfectly healthy sheep may be entailed upon the owners of the flocks in question, and the further inconvenience of inspection and quarantine. The rule was held to be unreasonable, and especially in view of the fact that under the laws of Congress regulating the inspection of sheep passing from one state into another, the sheep would be dipped under the inspection of government officers prior to being started upon their journey. But, as a condition of granting the restraining order, the complainants were required to cause their sheep to be dipped within ten days before entering the state under the supervision of the federal inspector, it appearing that one could be had, the court saying: "This will be an equivalent to the requirement of the Oregon law that all sheep within the state shall be dipped under the law of 1907 whether infected with disease or not."

As we understand that decision, it clearly sustains the reasonableness of the annual dipping provision of the statute, and the court's order in effect enforced that provision

as to the sheep in controversy by requiring them to be dipped within ten days before entering the state as an equivalent to the law applying to sheep regularly kept within the state.

In the Nevada case, Ex parte Goddard, supra, the statute of that state containing a provision similar to that of our statute complained of here, is quoted in the opinion, together with other provisions of the statute, and the court said:

"We are now brought to a consideration of the last point urged by counsel, to the effect that the statute in question is unreasonable, arbitrary and discriminatory. * * * It is clear, through a reading of the statute, and the rules adopted in pursuance thereof, that they were adopted purely as a police measure for the protection of the sheep of this state. * * * Every presumption is in favor of the validity of the statute and were there a doubt upon the question it would be our duty to resolve that doubt in its favor; and we are of the opinion that the reasonableness of the statute and the rules, and the good faith of the legislature and of the board in adopting the rules, are so apparent that there can be no question as to their validity."

In the case of Brazeale v. Strength, supra, a Texas statute requiring all cattle to be dipped whether infected with ticks or not, and whether kept on the owner's premises or not, was challenged as unconstitutional on the ground that it constituted an unwarranted invasion of private property rights. The court held that the statute did not violate the sections of the state constitution relied upon or the 14th amendment to the federal constitution, and said:

"Section 23 of Art. 16 of that constitution (the state constitution) authorizes the legislature to 'pass laws for the regulation of live stock and the protection of stock raisers.' The acts in question were passed for that purpose, and to accomplish it we think it was within the power of the legislature to require all cattle to be dipped without respect

to whether they were infected with ticks or not, or whether they were kept by the owner on his premises or not.''

In the subsequent Texas case, Walker v. State, supra, a prosecution for the failure to dip cattle, the court said:

''We do not think it necessary under the 1917 act to allege or prove that the cattle of the accused were affected with ticks, or that they had been inspected.  *  *  *  An inspection of one or any number less than the whole could not determine that a herd of cattle were free from ticks; nor would an inspection of a herd at a given date determine that the premises or range occupied by said cattle were free from ticks, nor that such herd might not, under ordinary conditions, be again affected by going upon an infected range, or by having infected cattle cross or come upon their range. As we understand it, the purpose of this law is to require the cattle of this state to be so treated as that fever carrying ticks, etc., will not attach themselves to such cattle whenever by accident or necessity the opportunity arises, and that to attain this end the legislature has seen fit to make obligatory, within the terms of the statute, the dipping of all cattle in this state in the kind and character of solution fixed by authority of the agency established for the execution of the law, to-wit: the live stock sanitary commission of Texas. The power to make this law is confided to the legislative branch of the government, and so long as its terms are not shown to be unreasonable, or their execution so arbitrary as to seem oppressive, we must uphold it. We find nothing in the act of 1917 which requires an inspection of the premises or cattle as a condition precedent to the dipping of cattle when properly notified to do so.''

The statute of Mississippi considered in McMillan v. Sanitary Board, supra, provided that all persons having cattle, horses or mules in any county or part of a county infected with the cattle tick shall, when notified by the proper inspector to do so, have his cattle, horses, mules and other live stock dipped at such time and in such manner as the regulations of the live stock sanitary board may require, the same

to continue for such period of time as required by the rules of the board "which shall be sufficient to completely destroy and eradicate all cattle tick in such county or part of county." The case was brought by the board to enjoin a cattle-owner from violating the rules of the board with reference to the dipping of cattle, under a provision of the statute that to carry out its purpose any person charged with any duty under it may be compelled to perform the same by mandamus, injunction, or any other appropriate remedy. It was alleged in the bill that the defendant had been prosecuted several times for failure to dip his cattle and "would get off with a light fine." The supreme court affirmed a judgment for the plaintiff board, holding that the statute made it the defendant's duty to dip his live stock whenever ordered to do so by the inspector and for his failure to do so could be fined by the criminal court and could also be compelled to perform his duty "by mandamus, injunction or any other appropriate remedy."

Having determined that the provisions under consideration are not subject to the objection that they are unreasonable or arbitrary, it follows that the legislation must be sustained as a proper exercise of the police power of the state. Its provisions apply alike to all sheep owners and all sheep within the state, and do not deny to anyone the equal protection of the laws. Nor, as affecting the right to enact the provisions in question, do they violate any of the constitutional provisions referred to in the demurrer to the information. On the contrary, its provisions not being unreasonable, the statute in that respect appears to be expressly authorized by the constitution; Section 1 of Article XIX providing: "The legislature shall pass all necessary laws to provide for the protection of live stock against the introduction or spread of pleura-pneumonia, splenetic or Texas fever, and other infectious or contagious diseases. The legislature shall also establish a system of quarantine, or inspection, and such other regulations as may be neces-

sary for the protection of stock owners and most conducive to the stock interests within the state."

It is fundamental law that the 14th amendment of the federal constitution does not impair in any way the police power of the states, nor limit the subjects in relation to which it may be exercised for the protection of its citizens. (6 R. C. L. 197, 198; Miller on the U. S. Const., 659; State v. Gurry, 121 Maryland 534, 47 L. R. A. N. S. 1087; 88 Atl. 546, Ann. Cas. 1915 B 957; Dirken v. The Great Northern Paper Co., 110 Maine 374, 86 Atl. 320, Ann. Cas. 1914 D 396; Barhier v. Connolly, 113 U. S. 27. 5 Sup. Ct. 357; 28 L. Ed. 923).

Some points are made with reference to the validity of the provision for a lien upon sheep dipped by the board for the expenses thereof, where such dipping has been made necessary through the failure of the owner or controller to dip them within the period required for the annual dipping. But that provision is not directly before us in this case, and if invalid, which we do not decide, that would not affect the validity of the provisions which are before us and have been considered. It may be said, however, that a provision for such liens is found in the statutes of other states.

The provision requiring the owner or controller of dipped sheep to file with an inspector or the board the affidavit of two persons who were present and assisted in the dipping, stating the number of sheep and bucks dipped, kind of dip used, the manner, time and place of dipping, seems to be peculiar to this statute, for we do not recall a like provision in the statute of any other state, although it is not impossible that other states may have such a provision or regulation unnoticed by us. It is also peculiar in that it adds an additional duty with relation to sheep that are dipped without any corresponding duty placed upon the owner or controller of sheep not dipped within the required period. The purpose, no doubt, is to furnish a record of dipped herds so that the board may the more readily ascertain what sheep or herds they will be required to dip after

the first of November. But, since the annual dipping is re-
quired to be under the supervision of an authorized sheep
inspector, the requirement of the affidavit from one who
has complied with the statute would seem in many cases to
be unnecessary, and particularly so in requiring an affidavit
of two persons. Yet, we do not understand it to be con-
tended that this renders that part of the statute invalid, and
we are not prepared to say that the provision is so unneces-
sary or unreasonable as to render the same arbitrary and
void. It would seem, however, that a record of dipped as well
as undipped sheep, to assist the board in performing the duty
imposed upon it, might be provided for by some other meth-
od less exacting so far as sheep owners complying with the
law are concerned. If the dipping is in the presence of an
inspector his certificate ought ordinarily to be sufficient.

The objections made to the statute as violating Section
24 of Art. III of the constitution, requiring with certain
stated exceptions that no bill shall be passed containing
more than one subject which shall be clearly expressed in
its title, are: That the title of the act is insufficient because
failing to clearly express the subject, and that the provisions
inserted by way of amendment are not germane to the act
amended. The general provisions of the section of the act
amended prior to the act of 1917 having been sufficiently
stated above need not be restated here. We have no doubt
that the new provisions in the act of 1917 might properly
have been included in the amended act of 1915, under its
title, as well as under the title of the original act of 1909,
and that such provisions are germane to the subject of the
amended section.

This court has said with reference to this constitutional
provision: ''The objections should be grave and the con-
flict between the act and the constitution palpable, before
the judiciary should disregard or annul a legislative enact-
ment upon the sole ground that it expresses more than one
subject, and when it contains but one subject, on the ground
that it is not sufficiently expressed in its title.'' (In re

Fourth Jud. Dist., 4 Wyo. 133, 140, 32 Pac. 850, 851). "The constitutional provision must be reasonably ·construed, for a narrow construction would impede legislation to such a degree that none but a precisian could successfully draft a valid enactment." (In re Boulter, 5 Wyo. 329, 339, 40· Pac. 520, 523).

Where the title of an act of 1901 stated its purpose to· be the amendment of a specified section of the "Revised Statutes of Wyoming," it was said, in answering the contention that such title could only refer to the revision of 1887, which was known by that general title, instead of the· revised statutes of 1899, and holding the act valid as intended to amend the stated section of the revision of 1899 : "If, therefore, the legislative intent is subject to no uncertainty, the act should not be held invalid, even though the reference in the title and in the body of the act to the· section to be amended is to be regarded as erroneous." (Hollibaugh & Bunton v. Hehn, 13 Wyo. 269, 282; 79 Pac. 1044, 1049). And it was held, in Commissioners v. Stone, 7 Wyo. 280, 51 Pac. 605, that in the case of amendments to· an unauthorized code, compilation or revision it is sufficient that the title refer to the section specifically, and declare the purpose to amend it, without further indicating the subject; the court saying that a reference to the section to be amended by number accurately indicates the general subject of the legislation to be affected by the amendment. And a title was approved which stated its purpose to amend and re-enact a specified section of the revised statutes where the grammatical structure of the remainder of the title was so peculiar as to convey no meaning, so that the sufficiency of the title depended entirely upon the declaration that the act was to amend and re-enact a specified section of the revised statutes. Several authorities were cited in support of the principle, which may now be said to be sustained by the clear weight of authority. In addition to the authorities cited in that case, we cite the following: (25 R. C. L. 871; 36 CYC. 1029-30, 1058; Lewis' Suth. Stat. Const. (2nd Ed.)

Sec. 141; Tresnon v. Supervisors, 120 Va. 203, 90 S. E.
615; Marston v. Humes, 3 Wash. 267, (Wash.) 28 Pac.
520; State v. Jones, 9 Idaho 693; (Ida.) 75 Pac. 819; State
v. Erickson, 125 Minn. 238, 146 N. W. 364; State v. Smith,
187 Ala. 411, 65 So. 942; Montgomery v. State, 107 Ala.
372; 18 So. 157; Ross v.Aguirre, 191 U. S. 60, 24 Sup. Ct.
22; 48 L. Ed. 94; Steele County v. Erskine, 98 Fed. 215,
39 C. C. A. 173; State v. Edwards, 34 Utah, 131; 95 Pac.
367; Ex parte Howe, 26 Ore. 181, 37 Pac. 536).

The language of Circuit Judge Caldwell in the opinion
in Steele County v. Erskine, supra, determined by the U. S.
circuit court of appeals for the 8th circuit, is so pertinent
that we quote the same, though perhaps unnecessarily there-
by extending this opinion. The court had under considera-
tion an objection to the constitutionality of a North Dakota
statute because of the following title: "An act to amend sec-
tion ten of chapter 38, laws of 1887, being section 545 of
the compiled laws." After stating that the amendment
was strictly germane to the subject of the original section,
the learned judge said:

"The subject of the act was the amendment of that sec-
tion which was accurately and appropriately designated,
and the section as amended was set out in full in the act.
The title sufficiently designated the subject of the act. It
plainly indicated the object and purpose of the act, which
is all the constitution requires. The subject of a statute is
one thing, and its detailed provisions quite another; one is
the topic, the other its treatment; one is required to be stat-
ed. in the title, the other not. The provision of the North Da-
kota constitution on the subject is identical with that of
Nebraska, and the Supreme Court of that state has uniform-
ly held that acts with titles like this,'An act to amend section
4 of chapter 55 of the compiled statutes of Nebraska,' are
valid, and that such a title is a sufficient compliance with
the requirement of the constitution. * * * This is the
general holding of the courts on the subject. * * *
Statutes with titles similar to the one here assailed are com-

mon in states having a constitutional provision like that in North Dakota. It is the usual and customary title where the state has a code of laws with sections numbered consecutively.''

It is said to be a general rule that to comply with the constitutional requirement the title of an act need only give such notice of the subject matter as to fairly and reasonably lead to an inquiry into the body of the bill. (Snyder County v. Waggenseller, 262 Penn. 269, (Penn.) 105 Atl. 297, 25 R. C. L. 848, 1 Lewis' Suth. Stat. Const. (2nd Ed.) 205.) And with reference to an amendatory act, it is stated, as a general rule, that ''if the title contains any reference to the law to be amended, or designation of it by which it can with reasonable certainty be determined what law is intended, it is sufficient.'' (36 CYC 1058.) It is also held in a number of cases that where an act is amendatory of an original act, the title of which in itself is adequate to cover the amendment, the constitutional requirement is satisfied, and the title of the amendatory act becomes unimportant. (Brown's case, 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110; Board v. Spilman, 117 Va. 201, 84 S. E. 163; Yellow R. Imp. Co. v. Arnold, 46 Wis. 241, 49 N. W. 971; State v. Jones, 9 Idaho 693, (Ida.) 75 Pac. 819; Vineyard v. City Council, 15 Ida. 436, 98 Pac. 422; St. Louis v. Teifel, 42 Mo. 590; State v. Ranson, 73 Mo. 78; Brandon v. State, 16 Ind. 197.) This doctrine, however, seems to be limited by some courts to cases where the title of the amendatory statute recites the title of the original act, or states in general language the subject of its provisions. (State v. Algood, 87 Tenn. 163, 10 S. W. 310; State v. Read, 49 La. Ann. 1535, 22 So. 761)'.

The objection to the statute in question is based upon the following title as published in the Session Laws of 1917: ''An Act to amend and re-enact Section 3, Chapter 107, Session Laws 1915.'' But that was not the complete title of the original bill as introduced in the legislature,

nor the title by which it is referred to throughout the legislative proceedings, as shown by the journals of the House and Senate. The bill was introduced in the House, receiving the number "House Bill No. 120," and its title was: "A Bill for an act to amend and re-enact Section 2691, Wyoming Compiled Statutes of 1910, as amended and re-enacted by Section 3, Chapter 107, Session Laws, 1915." This appears not only from the printed House Journal (page 126) but by the original bill in the custody of the Secretary of State. Upon first reading, it was ordered printed and referred to the standing committee on Stock Raising and Stock Laws, a significant reference showing an understanding of the nature of the bill. It was subsequently reported as correctly printed by the committee on printing (House Journal p. 145), Indicating that it was printed with the title as introduced. The standing committee to which it was referred for consideration recommended that it do pass, without amendment. (H. J. 195.) Having been introduced on January 30, 1917, the 16th day of the session, it was considered by the committee of the whole in the House on February 12, 1917, the 26th day of the session, and it was recommended by that committee that the title be amended so as to read as it is now published in the session laws, and that the body of the bill be amended in like manner so as to declare, as the act is now published, that "Section 3, of Chapter 107, Session Laws of 1915 be amended and re-enacted to read as follows," omitting the statement in the bill as introduced that "Section 2691, Wyoming Compiled Statutes 1910, as amended, etc., be amended and re-enacted. The title of Chapter 107, Session Laws of 1915, is as follows: "An act to amend and re-enact Section 2684, 2685 and 2691 of Chapter 178, Wyoming Compiled Statutes 1910, relating to the Board of Sheep Commissioners." And Section 3 of that act provided: "That Section 2691 of Chapter 178, Wyoming Compiled Statutes of 1910

be amended and re-enacted to read as follows;'' that being followed by the section in full as amended and re-enacted, commencing with the words and figures, ''Section 2691. Duty of inspector—Scab quarantine.'' The act of 1917, following the provision that the described section be amended and re-enacted, also contains the entire section as so amended and re-enacted, as required by the constitution (Art. III, Section 26) and at the beginning of the amended section, both in the original bill and the act as published, appear these words and figures: ''Section 2691.''

Throughout the journal record of the proceedings relating to this act it is referred to by its original title wherever the title is mentioned. In the report of the committee of the whole in the House the bill is referred to by number and by its title as originally introduced. The journal record of the second and third readings of the bill in the House, and the communication from the Chief Clerk of the Senate informing the House of the passage of the bill by the Senate, describes the bill by number and its complete title as introduced. (H. J. 283, 311, 380.) And the recital in the journal of the signing of the enrolled act by the Speaker of the House also refers to the bill by number and original title. (H. J. 436).

The same is true of the published proceedings of the Senate. The record in the Senate Journal of the first reading of the bill in that body refers to it as House Bill No. 120, and also by its original title, and the same recital is found in the journal proceedings of the report of the committee of the whole recommending the passage of the bill, which report, signed by the chairman, describes the bill as ''House Bill No. 120, a Bill for an Act to amend and re-enact Section 2691, Wyoming Compiled Statutes of 1910, as amended and re-enacted by Section 3, Chapter 107, Session Laws of 1915.'' (S. J. 315, 327.) In reciting the fact of the second reading of the bill in the Senate, its

passage on third reading, the signing of the enrolled act by the President of the Senate, the bill is referred to in each instance in the Senate journal by its original title. (S. J. 362, 374, 435.)　As engrossed after second reading in the house, the bill was given the title as amended in the House.　But the original title was endorsed on the back of the engrossed bill, and that was followed by endorsements showing the several proceedings of the House and Senate thereon.

The title of the bill as introduced was in perfect form and strictly complied with the constitutional requirement. It was ignorantly amended in the House, but without any evidence of bad faith or a desire to mislead.　And it is very clear that no member of either body could have been mislead by this change in the title; nor could anyone have been mislead, for the public usually obtains its information from the printed bill or newspaper references to it by the title shown in the printed bill.

Under the circumstances, in disposing of the objections to the title of the act, we think the question should be considered from the standpoint of the title of the original bill, which complied in every respect with the constitutional requirement.　And, therefore, it is unnecessary to consider whether a mere reference to a section of a specified chapter of an act of a particular session of the legislature would be sufficient generally, or where, as here, the described section amended and re-enacted a section of a compilation specifically described in the title of the amended act.　So we conclude that the act does not violate section 24 of Article III of the constitution.

This disposes of the constitutional questions raised by the demurrer to the information, and presented here by the exceptions of the prosecuting attorney.　There remains to be considered the question whether the facts stated in the information constitute an offense punishable by the laws of this state, raised by the first ground stated

in the demurrer. This will be considered, first, with reference to the first count of the information. That count charges that the defendant, "during the year 1918, in the County of Natrona, in the State of Wyoming, being then and there the owner or controller of sheep which are herded or kept within the State of Wyoming, unlawfully and knowingly failed and neglected to dip said sheep between the 15th day of April and the 1st day of November of the year of 1918."

The first objection urged against the sufficiency of that count of the information is based upon the use of the words "owner or controller," using the disjunctive, and it is argued that the owner might be one person and the controller another, so that if the owner dipped, or the controller, the other would not be guilty for failing to dip. We think this objection should have been raised on motion to quash, and would be waived by the filing of a demurrer under the provisions of our statute. (Comp. Stat. 1910, Sections 6186-6190.) It is said in the brief that there was a motion to quash which was overruled, and that it appears in the record in this case composed of the original papers. There is a document filed here endorsed "Original Papers and Journal Entries" which we find to include a motion to quash, but we do not find any journal entry disposing of such motion. However, that document is not a part of the record in this case. The only proper record in this case is the bill of exceptions of the prosecuting attorney. (State v. Cornwell, 14 Wyo. 526, 85 Pac. 977.) The bill does not contain a motion to quash, or any order overruling it, or exceptions with reference to the motion; and the case is here only upon exceptions taken by the prosecuting attorney.

It is also urged that the information is insufficient in omitting to allege that an authorized sheep inspector was available to superintend the dipping or that a dip was recommended by the board of sheep commissioners. We

think the objection is good as to the failure to allege in some manner that defendant had refused or neglected to dip in a dip recommended by the State Board of Sheep Commissioners. The requirement of the statute is that all sheep shall be dipped in one of the dips which have been recommended by said board, such dip to be used at a strength sufficient to eradicate scabies. And we think the first count of the information is insufficient because of the omission of such an allegation. The board of sheep commissioners might not have recommended any dip, and if so, there could have been no violation of the statute. But we doubt the necessity of alleging that a sheep inspector was available where the charge is an entire failure to dip. The defendant may show as a matter of defense that it was impossible to procure the supervision of an inspector. But we shall not definitely decide the question, preferring to leave it open to further consideration should it be presented in any other case.

It is also urged that the statute providing for the annual dipping of all sheep does not impose the duty of dipping upon the owner or controller. It is true that the statute does not expressly state that the owner or controller of sheep shall dip or cause them to be dipped, but we think, taking all the provisions of the section together, and especially the provisions added by the amendment of 1917, that it is clearly made the duty of the owner or controller of sheep to dip them. While the language of the statute is that all sheep kept or herded within the state shall be dipped between the stated dates, the next succeeding clause expressly requiries that the owner or controller of sheep so dipped shall file an affidavit of two persons showing the fact of such dipping, etc. And this is followed by the provision authorizing the board of sheep commissioners, after the first of November, to dip all sheep not previously dipped within the period required, charging the expenses to the owner. It was certainly the intention to impose the duty upon the

owner or the one responsible for such care and treatment, the latter being designated throughout the section, if not the owner, by the word "controller." It would be impossible otherwise to give the provision any meaning, and, in our opinion, by the strict construction required of penal statutes, the duty is imposed upon the owner or controller of sheep required to be dipped to dip them.

It is further contended that the two counts of the information are inconsistent, and that must be conceded. As previously stated, the duty of filing an affidavit showing the fact of the dipipng of sheep within the required period is imposed only upon the owner or controller of sheep that have been dipped. It is not alleged in the second count that the defendant was the owner or controller of sheep that had been dipped, but merely that, being the owner or controller of sheep herded or kept within the state, he unlawfully and knowingly failed to file an affidavit setting out the fact that his sheep had been dipped. For that reason said second count is insufficient to charge an offense. If the defendant's sheep were not dipped, then the duty was not imposed upon him to file the affidavit, and indeed, he could not then file a truthful affidavit showing that they were dipped. But the proper remedy for the inconsistency between the two counts would be to compel an election by the prosecuting attorney.

TIDBALL, District Judge, concurs.

Mr. Justice Blydenburgh being unable to sit when the cause was heard, Hon. V. J. Tidball, Judge of the Second Judicial District was called in to sit in his place. The death of the late Chief Justice Beard, who also sat in the case, occurred before the completion of the opinion, but he had concurred in the several conclusions.