## STATE v. OSCAR C. HODGES.

(Filed 24 December, 1920.)

**Health—Cattle—Eradication of Ticks—Constitutional Law—Quarantine —Statutes.**

> The regulation of a quarantine district laid off and enforced in pursuance of C. S., 4688 (3) and 4873, for the eradication of ticks on cattle under the authority of the commissioners of the county affected, and the State and Federal Departments of Agriculture, and also under the State and Federal inspections therein provided for, requiring those in the district to have their cattle dipped in a solution, and by methods furnished them, to get rid of the ticks on the cattle and prevent infection, is a reasonable and valid regulation.

APPEAL by the State from *Calvert, J.,* at November Term, 1920, of BEAUFORT.

STATE v. HODGES.

· The defendant was indicted for the violation of the rules and regulations adopted by the State Board of Agriculture to prevent the infection of sound cattle from other cattle infected with tick fever and to cure those already infected. The complaint averred that the defendant in Washington Township in the county of Beaufort, "on or about 1 October, 1920, unlawfully and willfully refused for five days, after notice, and continues to fail and refuse, to dip certain of his cattle, to prevent the infection of cattle ticks, in vats prepared for said purpose, and containing an improved solution, under and by regulation of, the Board of Agriculture of North Carolina, he being the owner and keeper of cattle and premises, and served with official notice of said regulation and quarantine thereunto established and living in a territory and section of said State and county wherein the work of tick eradication had been taken up; quarantine including said county duly established by State and Federal agricultural authorities, and notice thereof duly proclaimed; in violation of regulations of said department of agriculture, passed 11 June, 1919, and contrary to Compiled Statutes, 4688 (3) and 4873."

The defendant was tried before the recorder's court on this charge and upon appeal to the Superior Court the jury found by special verdict that the charge was true, and that by regulation 2, secs. 2, 3, 7, and 28 of the North Carolina Department of Agriculture, passed 11 June, 1919, the work of tick eradication in Beaufort County was taken up under the authority of the commissioners of said county, and of the State and Federal Departments of Agriculture, and an order was made that cattle infected with, or exposed to, cattle tick fever should be dipped by their owners at stated intervals; that vats containing approved solution for this purpose of eradicating tick fever had been provided in said territory and available to the defendant, who was the owner of cattle and premises in said territory and available to said vats, and though due notice had been given him as prescribed by regulation, he had refused and failed to dip his cattle.

Upon said special verdict the court was of the opinion that the defendant was not guilty, and judgment was entered accordingly. Appeal by State.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*No counsel contra.*

CLARK, C. J. C. S., 4688 (3), provides that the commissioner and Board of Agriculture shall have authority to make "investigations adapted to promote the improvement of milk and beef cattle, and special investigations relating to the diseases of cattle and other domestic ani-

mals, . . . and shall have power in such cases to quarantine the infected animals and to regulate the transportation of stock in this State, or from one section of it to another, and *may coöperate with the U. S. Department of Agriculture in establishing and maintaining cattle districts or quarantine lines to prevent the infection of cattle from splenic or Spanish fever.* Any person willfully violating such regulations shall be liable to a civil action to any person injured, and for any and all damages resulting from such conduct, and shall also be guilty of a misdemeanor."

The validity of such statute conferring power on the Board of Agriculture to make regulations within the purview of this section was upheld in *S. v. R. R.,* 141 N. C., 846, and *S. v. Garner,* 158 N. C., 630. The Legislature can authorize municipalities to require persons to be vaccinated. *S. v. Hay,* 126 N. C., 999; *Morgan v. Stewart,* 144 N. C., 424, and in other matters, *S. v. Beacham,* 125 N. C., 652; and in many other instances. *Shelby v. Power Co.,* 155 N. C., 196; *Durham v. Cotton Mills,* 141 N. C., 615; and many other cases. *A fortiori* the power to make regulations can be confided to a State administrative board.

C. S., 4873, provides that upon proclamation being made of a quarantine, "The Commissioner of Agriculture shall have power to make rules and regulations to make effective the proclamation, *and to stamp out such infectious or contagious diseases as may break out among the livestock in this State."*

By virtue of the authority, the State Board of Agriculture passed the regulations in question. Regulation No. 2, section 2, requires the State Veterinarian to coöperate with the U. S. Department of Agriculture in the eradication of the fever tick, and the Commissioner of Agriculture was authorized to appoint inspectors to work under inspectors of the U. S. Department of Agriculture and the State Veterinarian.

Section 3 provides that the work of tick eradication shall be taken up in any county when the Commissioner of Agriculture deems it wise and best, and shall issue notice to that effect.

Section 7 provides: "When an owner or keeper of cattle and premises is served with official notice of quarantine, said cattle shall be properly and thoroughly disinfected by him regularly every 12 or 14 days under supervision of the State Veterinarian or a duly authorized quarantine inspector in an approved dipping solution until such a time as it is ascertained by a regular official inspection that the cattle and premises are free from ticks and notice of such has been given by the quarantine inspector. If the owner or keeper of cattle fails within 5 days after notice to adopt the recognized and approved methods of disinfecting cattle established in the county he shall be liable for prosecution for each offense."

"Section 28.   The annual order of the U. S. Department of Agriculture, and amendment, naming the counties in North Carolina which are in quarantine on account of the cattle tick (*Margaropous annulatus*), is hereby adopted and approved, and in addition to these counties, those counties which the Commissioner of Agriculture may deem necessary are hereby declared under State quarantine."   The county of Beaufort was one of these counties.

The facts found in the special verdict placed beyond question the violation of the above regulations, and specially section 7, which is set out in full, nor is there any question under the above quoted decisions of this Court that the General Assembly could delegate the power to make such regulations upon the Board of Agriculture.   The only question presented is whether the statute authorized such regulation.   We think it did.   ·C. S., 4688 (3), provides that the State Board of Agriculture "may coöperate with the U. S. Department of Agriculture in *establishing and maintaining cattle districts and quarantine lines.*"   The board has accordingly, in coöperation with the U. S. Department of Agriculture, established Beaufort County as a cattle district within the quarantine lines for the purpose of disinfection.   The method of disinfection is that prescribed by the United States authorities, and the work is being done in "coöperation" with them.

C. S., 4873, has given the Commissioner of Agriculture the power to make rules and regulations "to stamp out such infectious or contagious diseases as may break out among the livestock of this State."   Section 7, above set out, is in pursuance thereof, and, authorized by the above statutes, any violation thereof is a misdemeanor under the terms of the statute.

The eradication of the cattle tick is a matter of national importance, and especially to the South, for beyond a certain isothermal line running through northern Virginia and thence through the mountains of western North Carolina, and then northwesterly again, the cattle ticks are destroyed by the winter freezes.   The Federal Government has spent vast sums of money, in coöperation with smaller sums contributed by this and other States in which, by reason of the milder winters, the tick pest is perennial except where it has been eradicated by the action of the State and Federal Governments.   Already many States have been rendered absolutely free from the pest, and the Federal statutes control the shipping or the passing of cattle from those parts of any State not yet free from the pest into the other parts of the Union.   The map on next page shows (dotted line) where the quarantine line between the free and infected districts stood in 1906.   The shaded portion shows where it now stands, having by the gradual action of the State and the Federal Governments been pushed eastward until only 21 counties in North Carolina

STATE *v.* HODGES.

Dotted line shows quarantine of 1906. All counties below and east of this line quarantined on account of the cattle tick.
Twenty-one shaded counties under quarantine December 1, 1920.

remain in the infested district, most of them being small counties in area, and even beyond the quarantine line of 1920, one county (Pasquotank) is already freed. The work of pushing the line eastward and freeing those counties is being pressed in several counties, among them the county of Beaufort, in which the defendant claims the right to halt the State and Federal Governments in this great work which is doing so much for the benefit of agriculture, as well as the stock-raising interests.

The cattle tick is being stamped out in the South, in which alone any infested districts still remain. Indeed, it may be said that good livestock is the basis of good farming. When there is no manure with which to enrich the soil, the farmer must depend upon one or two cash crops. With tick-infested cattle the result is much the same, for scrubs do not turn into beef and milk to the same extent as graded stock, and they cannot be shipped across the line for any purpose whatever, for sale, or otherwise, into tick-free territory, which now embraces nine-tenths of the whole country.

There is no known method that will free any territory of ticks except that of dipping in the manner and with the material prescribed by the U. S. Department of Agriculture, which furnishes trained men to supervise the dipping of cattle, without charge. Under such trained supervision there is no danger of injury to cattle. The cost of the dipping vat for the neighborhood is estimated at from $40 to $50, and the cost of material used in preparing the bath is less than 5 cents a season for each head of cattle dipped. The United States authorities estimate in their official reports that the still infected parts of the South cost this section $50,000,000 annually.

The work that has already been done will be in vain unless it is pushed to completion, for the Government reports show that each tick, as it drops off the animal when full of blood, is also full of eggs, of which it lays from 3,000 to 5,000 on the ground. These, when hatched, lay in the grass and weeds ready to board the first animal that comes along. The Government estimates that dipping makes even a tick-infested steer worth from $5 to $10 more. The effect of the tick pest upon the cows is still worse, as it reduces the flow of milk 42 per cent—a loss of $30 per cow per year. The above data is taken from the official reports issued by the United States Government, which has spent far more in this State for this purpose than the State itself.

The prosecution of the work, until the utter and final elimination of the pest is necessary, for if this destruction is stayed it will return and again occupy the territory which has been freed already at Government expense to the benefit to the whole country.

From 1906, when this coöperative work was first undertaken, to 1 December, 1920, a total of 510,091 square miles was released from Federal quarantine which had been established to control the situation, and in considerable additional area the work was well under way.

A Swim Through the Arsenical Dipping Vat and the Cattle Are
Freed From Blood-sucking Ticks

In view of public policy evinced by Federal and State legislation, and the great benefit that has resulted, the Court should give a wise and liberal construction to the rules and regulations for the eradication prescribed under the statute by the boards of agriculture. The tick is to stock what the hookworm is to children. We think the above regulations are reasonable and well within the intent and purport of the statute. The presumption, if any, is that administrative regulations are valid. The burden is on the State to prove a violation thereof, but that is not denied, and is found as a fact.

Reversed.