## ARMSTRONG v. WHITTEN et al.
### No. 40.

District Court, S. D. Texas, at Corpus Christi.
May 9, 1930.

R. L. Batts, of Austin, Tex., for plaintiff.

Robert Lee Bobbitt, Atty. Gen., W. Dewey Lawrence, Asst. Atty. Gen., and Boone & Savage, of Corpus Christi, Tex., for defendants.

HUTCHESON, District Judge.

This is a suit for injunction brought by plaintiff, joint owner with his brothers and sisters of property situated in Kennedy county, Tex., known as the "Armstrong Ranch," against the defendants Whitten, Anderson, and Martin, constituting the livestock sanitary commission of the state of Texas, and against the county judge and county commissioners of Kennedy county, in which it is alleged that an act of the Legislature, known as House Bill No. 77 (chapter 53), Livestock Tick Eradication Act, passed by the First Called Session of the Forty-First Legislature of the state of Texas, to become effective August 20, 1929 (Vernon's Ann. P. C. Tex. art. 1525c, §§ 1–37), is arbitrary, unreasonable, and violative of the Constitutions of the state of Texas and of the United States as it affects plaintiff, and in which the prayer is that the defendants be enjoined and restrained from proceeding under the act, in execution and enforcement of it. The substantial allegations of fact are:

That plaintiff is in the actual possession and in the active management of the ranch property for himself and his co-owners. That the ranch, consisting of practically 50,000 acres subdivided by ranch fences, is being, and has been, used for nearly fifty years, by ranch cattle bred and raised thereon, and sold therefrom profitably to its owners.

It is specifically alleged and firmly counted on as a ground for injunctive relief that plaintiff's ranch is in the territory to which the fever carrying tick (to the eradication of which the act in question is directed) is in-

digenous, and that cattle on his ranch, though tick infested, have acquired immunity from the cattle fever, and because thereof may be, without danger to them and with profit to the owners, bred, raised, and marketed from their pastures.

Plaintiff alleges, on the other hand, that if they should now be subjected to systematic dipping, and the ticks now on them be removed from them, they will soon lose their immunity from the fever, and, being in the territory to which the ticks are indigenous, will become reinfested with the ticks, will take the fever, and many of them will die.

In this connection plaintiff alleges that the complete eradication of ticks in Kennedy county, and particularly on his ranch, is impossible, because of its contiguity to the republic of Mexico, and because of the brushy, tick-infested areas abounding in deer and other wild animals, also tick-infested, and that the result of systematic dipping on his ranch will merely be to convert his cattle from immunized, and therefore healthy hosts for the ticks, to susceptible and therefore dead and dying hosts therefor. That this immunity or tolerance which his cattle have acquired is a property right which cannot be taken from him, as the statute proposes to do, without compensation.

Plaintiff further alleges that he has always complied, is now complying, and will continue to comply, with all federal regulations governing the shipment of cattle from tick-infested areas; that he does dip his cattle before shipment, as required, and will continue to do so, and that, notwithstanding the fact that plaintiff does comply with all the regulations affecting the movement and shipment of his cattle from his ranch, notwithstanding that while plaintiff's cattle are on his ranch they are confined by fences upon his land, and are not allowed to move therefrom, or become a menace to the lands or cattle of others, and notwithstanding the valued and vested right which he has acquired in the practical immunity of his cattle from splenetic fever while on his ranch, the act authorizes and defendants propose a forcible entry upon plaintiff's premises, to there put into effect a course of systematic dipping, which course, if applied to plaintiff's cattle, will not only deprive him of the valued rights which he has in the immunity of his cattle as above alleged, but will further result in the taking of his property without compensation, in that the use and application of the prescribed dip will not only subject him to great expense for the dipping, and great injury in

the management and conduct of his ranch while such dipping is going forward, but the use and application of the prescribed dip will cause injury and death to his cattle, and thus the whole course proposed will result in the taking of his property without adequate compensation and without due process of law, both of which he is guaranteed by the Constitutions of the state of Texas and of the United States.

In addition to these general attacks upon the act as a whole as violative of due process, and as constituting a taking of his property for public use without compensation, and as operating as an unjust and unreasonable interference with his right to control and manage his own business, plaintiff levels a further general attack upon the law, upon the ground that it contains provisions directing and controlling its operation and application which are in themselves so unreasonable and violative of the constitutional rights of plaintiff, and are such integral and essential parts of the act itself, as that they permeate the whole act, so that the act cannot live without them, and, being themselves void, take life from the act.

Plaintiff presents that proposition in this way: "The tick eradication act is a single act, having a single purpose, and all its provisions are for the accomplishment thereof. Notwithstanding the provisions which undertake to save such parts of the law as are not specifically declared unconstitutional, the presence in the law of a large number of unreasonable, arbitrary and unconstitutional provisions assumed by the Legislature to be essential, and all having a single purpose, render the entire Act unconstitutional," and under it he presents many specific attacks upon the law.

First he declares that the act in three provisions, at least, confers upon the commission, the chairman of the commission, the supervising inspectors of the commission, arbitrary and unrestrained power to discriminate in the application of the compulsory provisions of the act, thus constituting a delegation of power to suspend or make effective a criminal law, the result of which is not only to destroy the law, because of this unconstitutional delegation, but to destroy it because the suspensions as authorized make uncertain whether and when the law is operative, and thereby invalidate it.

He declares that the law authorizes the commission to conclusively determine whether the systematic dipping shall be undertaken

on particular property; that it authorizes a supervising inspector "to excuse the dipping of live stock after the issuance of written instructions requiring dipping"; that it authorizes the commission "for good cause to waive in writing the provisions of Sec. 26," the section (Vernon's Ann. P. C. art. 1525c, § 26) prohibiting the removal of cattle from pastures except under certain regulations and conditions.

He further complains of the provisions in the law which authorize peace officers to go upon plaintiff's premises and seize and dip his cattle, in the event plaintiff refuses to dip. He attacks the act because, as he claims, the arsenical solution prescribed by law is of too uncertain a character for any one to understand it, and that it leaves the law indefinite and invalid; that the law is unreasonable, in that it does not give persons the option of vacating their pastures for the time necessary for the ticks to die for want of hosts, rather than of dipping the cattle.

He complains of those provisions of the law which authorize private citizens to bring injunctions to compel compliance with it; which provide certain rules of evidence in the trial of civil and criminal cases under the act. He does not, however, allege that any proceedings, either civil or criminal, are now actually pending against him in which such unreasonable rules are sought to be applied.

He specifically attacks the act because it provides for compulsory dipping, not upon a finding of sufficient infection to justify dipping, but upon the mere decision of the commission without a standard upon which that decision should rest. He declares that the law provides high civil and criminal penalties as the consequence of disobedience of the orders of the commission under an act which leaves indefinite and uncertain the facts which constitute a violation, especially since the law authorizes the commission to make discriminatory and unreasonable application of its provisions, authorizing it to compel compliance from one citizen and to excuse another from compliance; that not only for the original dipping, but for redippings, the act gives the commission unreasonable authority to order them without fixing a basis or standard of facts upon which their order should rest, and he finally declares that the act is designed, in the extreme and unreasonable provisions for enforcement which it contains, to have the effect of terrorizing persons into a compliance therewith, in that in particular section 15 (Vernon's Ann. P. C. art. 1525c, § 15) authorizes the cattle to be seized

and dipped systematically by peace officers in the event the owner refuses to comply, authorizing the officer to charge, in addition to other expenses, $2 per head per dipping, with the result that, if such provision is carried out, the systematic dipping of his cattle would cost considerably more than the cattle were worth.

After the filing of the petition, and before the matter had come on for hearing on the prayer for a temporary injunction, the plaintiff and the defendants agreed that no temporary injunction would be applied for, but that the case would be heard upon its merits before the judge of the district, and that no statutory court should be convened.

Thereafter defendants filed their answer, stating in substance that the act sought to be enjoined was a beneficial and practical legislative measure, enacted under the express authority and direction of the Constitution of the state of Texas, directing the Legislature to pass laws regulating the raising of live stock and for the protection of stock in the stock-raising portions of the state; that the act was designed and was effective to eradicate the fever carrying tick in the territory described in it; that it was passed as the result of a policy established, approved, and applied in many states, and in the state of Texas itself, for many years; that it was a valid exercise of the police power of the state in the interest of the state's greatest single industry, and that, so far from the act being incapable of enforcement, injurious and detrimental to plaintiff, its enforcement was practical as the results had proved, and that it would, in plaintiff's case, prove beneficial and helpful; that the cost of complying with it would be small and insignificant in comparison with the benefits which compliance with it would bring, and that, in short, it was a beneficial exercise of the power of the state to bring about the freeing of the state from the universally recognized menace of splenetic fever, and, in the interests of a great industry and of the state generally, to make it possible to improve the breed, increase the output, enlarge the markets, and better the quality of the cattle raised in this state.

To the specific attacks upon the statute the defendants replied, denying each of the complaints, and asserting that each of the provisions complained of was reasonable; that none of them had the effect to authorize any one to suspend the operation of the law, but they merely made reasonable provisions for the exercise of administrative judgment

in enforcing the law; and, finally, that plaintiff by his own petition showed that his cattle were tick infested; that his pastures constituted a menace to the adjoining pastures; that therefore he was not in a position to complain of any of the provisions of the act in so far as they applied to, or might apply to, persons or territory whose cattle were not tick infested, and that, in so far as he undertook to complain of the rules of evidence or procedure, it would be time enough for plaintiff to complain of those when he found himself involved therein.

On the trial of the case considerable evidence was offered by both plaintiff and defendants. This evidence presented little conflict, and all tended to the following conclusions: That plaintiff's cattle did not have immunity from, but tolerance for, splenetic fever; that, though hosts for the ticks, which dropped by them, upon, or coming from them to other cattle not having such tolerance, would cause fever, they themselves do not suffer from it, and, if entirely freed from ticks by systematic dipping, they would lose that tolerance, and become subject to the fever when reinfested with ticks.

It also abundantly established that the eradication of ticks by systematic dipping, from cattle was not only practicable, but that it had been accomplished in many states and in many localities in the state of Texas; that, in fact, plaintiff has the only pasture in that locality which had not undertaken and substantially accomplished systematic tick eradication; that plaintiff's pasture as it stood constituted a menace to other pastures and other cattle in that section and neighborhood, because of the fact that ticks dropped near his fences might crawl several feet, might be carried by streams, and in many other ways might be conveyed from the pasture of Armstrong to the pastures of others.

The evidence showed overwhelmingly:

That the expense of tick eradication, if properly conducted, was comparatively slight, and that the benefits of it were immeasurably greater than the expense. That losses and injury to cattle through such eradication was slight, and that the breed, quality and value of animals where the tick had been eradicated, had greatly increased.

That, while it is true that there are markets available to plaintiff, in tick-infested territory, which are not available to nontick-infested cattle, since his cattle, being tick infested, could be safely shipped there, much better and wider markets would be available to plaintiff if his cattle were tick free.

That the arsenical solution properly used was not dangerous, and that the handling and moving of cattle in the course of the dipping under proper and careful supervision was not substantially injurious to them. That, in short, the general measures provided by the act were reasonable and effective to the end desired, the eradication of ticks, and at the conclusion of the hearing it became apparent that the only substantial questions presented by plaintiff were: (1) Whether generally the Legislature of Texas has the power to provide for tick eradication; that is, for the entry upon the premises of plaintiff there to eradicate the ticks, as distinguished from the power of quarantine, or to require the ticks to be removed before and as a condition of shipment, which power of quarantine and to remove ticks before shipment was recognized by plaintiff; and (2) whether, especially in view of the immunity of plaintiff's cattle, the exercise of such power of tick eradication would be a taking of property without compensation under the constitutional prohibition, or whether the exercise of such power would be that exercise of police power which may proceed without compensation being made or provided.

Subordinate to these questions were the questions: (1) Whether, if the general power existed, the act was invalid as charged by plaintiff, because it contained provisions for the exercise of powers so unreasonable as to be themselves invalid, and so essential to the act as, invalid, to strike the act down; and (2) whether, if the act as a whole was not invalid, plaintiff is in a position at this time to complain of any of the separate provisions, and to obtain relief against them.

■ I think a careful consideration of the act, the purposes and objects of which are quite well set out in its title, appended hereto as an exhibit [see end of opinion], shows its purpose and object to be to provide through the supervision of a live stock sanitary commission for the eradication from the state of Texas of the fever carrying tick, that all of the sections or features of it complained of by plaintiff are mere details for the carrying out of the main purpose, the eradication of the tick, and that it was the intention of the Legislature that the invalidity of any particular section should have no effect upon the act as a whole.

This is not only shown by section 39 of the act (Acts Tex. 41st Leg. 1st Called Sess. [1929] c. 43) providing "This Act shall be liberally construed, and if any Section hereof shall be declared invalid, the remaining parts

of the law shall not be affected thereby," but is made clearer by the terms of the act itself, wherein, over and over again by section after section, supplementing, aiding, extending, and enlarging, provision is made for the thing to which the act is directed, the eradication of the tick, by the co-operation of the owners, by injunction suits, by criminal penalties, by forcible dipping—throughout them all the purpose running clear to remove from the cattle in the infested areas of Texas, the ticks which infest them, and I am in no doubt whatever that, if any of the provisions which plaintiff complains as authorizing a suspension of the law are in fact invalid because thereof, those provisions, and not the law, must fall, and if in any part of the law the procedure prescribed is invalid, that procedure, and not the law, must fall; that in short, no separate provisions complained of by plaintiff, and no construction of them, can, if the law is otherwise valid, invalidate the law.

██ It remains then to consider, first, if plaintiff may have relief against the law because it deprives him of a valuable right, or subjects him or his property to injury, without due process of law; and, second, whether, if plaintiff may not obtain relief against the whole act, there are any provisions in it of which plaintiff may now complain, and from which he may now be relieved.

It is fundamental that, if the act as a whole is invalid, that is, if the Legislature has no power to compel plaintiff to take up systematic· tick eradication, under the facts alleged and proved in this case plaintiff would be entitled now to the injunction prayed for, though no action has been taken to enforce it, since the act itself would constitute a threat against his property and a destruction of its value, against which he would be entitled to relief. Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016. While, if plaintiff can be compelled to a course of systematic dipping, and the act in its general features and purposes is valid, but only some subordinate and interior feature of it is in question, plaintiff cannot now obtain an injunction against those features, even if generally invalid, but must wait and apply for relief against such provision when it is first sought to be applied against him. Railroad Commission Cases, 116 U. S. 307, 6 S. Ct. 334, 388, 1191, 29 L. Ed. 636.

This rule of law is particularly applicable to this case, for, since the act permits, nay, directs, plaintiff to manage and handle his own dipping under it, and since not only does plaintiff admit that his stock need dipping to relieve them of ticks, but claims that his ranch is so affected that he has thereby acquired immunity, since the evidence is overwhelming that, if a skillful and qualified ranch owner will dip and handle his own cattle, he can do so with comparatively small cost and practically no substantial injury, if it is found that the Legislature has the power to require the systematic dipping of cattle, it must be assumed by the court so finding that the plaintiff will not deliberately refuse, and thus subject himself to the practices and penalties prescribed in the act for forcible dipping. Acting upon this assumption, it will leave the question of whether, in any particulars, the enforcement of the law or any of its penalties operate extremely or unjustly to be determined when a case is presented which shows just what pressure is on the plaintiff and what the circumstances of the exertion.

This being true, it is not important now to undertake to determine whether the plaintiff might, under different conditions, have just grounds to attack the statute because it provides for an injunction without a jury trial or obligates persons who are not owners of cattle to dip the cattle of others, or authorizes the inspector to waive dipping, or the commission to waive dipping, or that it authorizes the commission to require dipping where cattle are not tick infested, or that it provides an uncertain standard to determine whether cattle are so tick infested as to require dipping, for the record affirmatively shows that the plaintiff owns the cattle in question, and that they are substantially all tick infested; indeed, the plaintiff himself so alleges.

There is neither allegation nor proof that the plaintiff has been discriminated against in favor of other persons or that the plaintiff has been, or is about to be, proceeded against by injunction, or that any particular rule of evidence has been applied against him, or that any of the specific things complained of as illegally provided by the act have been or will be done in any way to affect injury to the plaintiff, and it is but an academic speculation to consider what ought to be done to relieve plaintiff against a case which has not yet arisen and which may never arise.

██ As to the complaints of the law that it leaves the enforcement of it to the arbitrary discretion of its administrators, I do not agree with plaintiff. There are provi-

sions in it which in an effort to temper its rigors seem to confer some discretion on the officers charged with enforcing it, but these provisions do not permit or authorize the commission, or any of the officers, either to enact or suspend a law.

At the most they are but legislative declarations of the right to exercise that discretion, which, without such declaration, inheres in all officers charged with the application and enforcement of law to enforce law with judgment and with due regard to the particular circumstance.

It is still fundamentally and broadly true, as it was in simpler times, that this is a government, not of men, but of laws, but it always has been and due to the complexity of modern life is daily becoming more true that, in order for law to be properly, wisely, and efficiently applied, full provision must be made for its wise administration. It is not necessary to cite cases like United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; Brazeale v. Strength (Tex. Civ. App.) 196 S. W. 247, that the Legislature may delegate to an administrative board the power to make rules and regulations and to administratively enforce the act committed to their charge, for this principle has become axiomatic in a civilization and under a government such as ours is, and especially is this true with reference to legislative regulations such as the one in question, which not only cannot, but ought not, to be self-operating or self-enforcing, but need and must have administrative application. There is nothing in the law with which a person desiring to do so cannot easily comply. If the plaintiff persists in his view that, though the law be valid in its general aspect, though the general right of the Legislature to compel tick eradication be unquestioned, the act in question provides unconstitutional means to enforce it, it will be time enough for the court to determine whether his situation is such as to entitle him to relief when he feels the pressure of the particular provisions of which he complains, and it will be time enough then for the court to determine whether his circumstances and situation are such as to entitle him to the aid of a court of equity, if his purpose, as then disclosed, is not arbitrarily to defeat the just enforcement of the law, but to protect himself from an unreasonable and unfair administration of it.

I think it not inappropriate to say here, however, in a tentative way, reserving final opinion until the matter actually arises, that in my opinion the provisions for the assessment of $2 per head for dipping would be unreasonable, excessive, and arbitrary, if applied to plaintiff's ranch, and that, if such procedure is taken against him, and such an assessment is sought to be made against his cattle, he would be entitled to relief against that assessment. It seems to me now, however, that the paramount consideration in this case is that the Legislature has undertaken, by a comprehensive scheme, to eradicate the fever tick, and that all the provisions of the act are designed for, and should be considered in the light of, that purpose; that, while some of them may, if rigorously applied, as provided in the act, result in hardship, such hardship is now a purely speculative one, and, if the act in its general terms is valid, plaintiff should wait for the determination of the subordinate questions raised until such time as he presents a concrete situation under the act, when he may ask this court to determine whether the law, as applied to him in some particular point, violates any of his privileges.

Confining my attention, then, to the questions which seem to me to be determinative of this case, I shall consider whether the act, the purpose, intent, and effect of which, if put into operation, would be to bring about tick eradication, is within the police power of the Legislature, and whether, as applied to plaintiff at this time, any of his rights are unconstitutionally abridged.

Much argument and citation of authorities have come from both plaintiff and defendants upon the power of the state in the exercise of the power of police to destroy private property without compensation. Defendants cite Miller v. Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 568, where the destruction of cedar trees at the order of the state entomologist was sustained under the Cedar Rust Act of Virginia as a valid exercise of police power, while plaintiff cites Stockwell v. State, 110 Tex. 550, 221 S. W. 932, 12 A. L. R. 1116, where the destruction of a hedge under the order of the inspector of the department of agriculture was enjoined as not a valid exercise of police power, and Crossman v. Galveston, 112 Tex. 303, 247 S. W. 810, 26 A. L. R. 1210, where the order of the city of Galveston requiring the destruction of dilapidated buildings was held to be beyond the power of police.

This and the questions so urgently discussed in connection with the point to which these cases are cited as controlling, as to whether the defendant's situation in the particular case constitutes a nuisance, and the

extent to which the Legislature has the power to declare and define nuisances, I pass as not important here, for it seems to me that none of these cases are applicable, for here is no case of the destruction of property.

Here is a case merely of the regulation and control of it in the interest of the health and safety and public welfare of the state and its inhabitants, and, if it were necessary to secure analogous cases to the one at bar here, they are to be sought, not in cases involving the destruction of property, but in cases involving the control and elimination of disease, of which Jacobson v. Massachusetts, 197 U. S. 22, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765, is typical, in the plant and animal quarantine and pest eradication cases, of which Balch v. Glenn, 85 Kan. 735, 119 P. 67, 43 L. R. A. (N. S.) 1080, Ann. Cas. 1913A, 406, and Rasmussen v. Idaho, 181 U. S. 198, 21 S. Ct. 594, 45 L. Ed. 820, are representative.

It seem to me, however, that the law of this case is well settled upon the very point in question, and that not analogous, but express authority may be found in that long line of cases from the Southern States, including many from the state of Texas itself, directed to the elimination of the very evil here presented, the Texas fever tick, in the very way here proposed, and sustaining in every way the power of the state in that regard.

Of those cases, though numbers might be cited, it will be sufficient to cite the leading cases outside of Texas, Stine v. Lewis, 33 Okl. 609, 127 P. 397; State v. McCarty, 5 Ala. App. 212, 59 So. 543; State v. Hodges, 180 N. C. 751, 105 S. E. 417; Davis v. State, 126 Ark. 260, 190 S. W. 436; Reid v. Colorado, 187 U. S. 137, 23 S. Ct. 92, 47 L. Ed. 108; State v. Hall, 26 Wyo. 224, 194 P. 476; Thornton v. U. S., 271 U. S. 415, 46 S. Ct. 585, 70 L. Ed. 1013, while the Texas cases have always sustained such acts upon the ground of economic and health reasons, and more particularly upon the authority of article 16, § 23 of the state Constitution, authorizing the passage of laws for the regulation of live stock.

Texas cases in point are Brazeale v. Strength (Tex. Civ. App.) 196 S. W. 247; Walker v. State, 87 Tex. Cr. R. 186, 222 S. W. 569; Neal v. Boog-Scott (Tex. Civ. App.) 247 S. W. 689.

In the light of these authorities, all of them sustaining the right of the Legislature to provide for and carry out forcible dipping on the premises of the owner, and none of them denying it, it seems to me that no question can now be raised as to that power anywhere, and especially not in Texas, where the Constitution itself provides authority for such power in the provision for "the protection of livestock."

Here plaintiff's property constitutes a constant and active menace. The truth is that ticks dropped at a pasture fence do crawl several feet, that in a short time a few ticks produce millions of ticks, and that, as long as the Armstrong pasture stands where it is, it constitutes a menace to the pastures around it, not only from animals leaving his pasture and going into others, but from floods and freshets bringing ticks down and depositing them in other pastures where they fall and mature.

Matters standing thus, the Legislature has the power to eradicate this menace, and without compensation, unless the fact that plaintiff's cattle have acquired tolerance for the disease, and the taking away of that tolerance will expose them to disease presents a case of vested right which cannot be taken away from plaintiff without compensation. The situation in this case on that point is that Armstrong alone, of all his neighbors, has tick infested pastures and tick infested cattle; that his situation presents a menace to his neighbors he himself declares, for the very basis of his suit is that, if the ticks are removed from his cattle, they will then lose their immunity and become subject to danger from reinfestation.

Standing there, thus situated, as a standing menace and threat to his neighbors of reinfesting their tick-free cattle, and without making any effort to comply with the law reasonably, or at all, he seeks, by a tale of imagined injuries, not supported by the evidence, to preserve to himself a right which he enjoys in violation of positive law, and at the expense of, and as a menace to, his neighbors. Having the greatest sympathy with that spirit in a citizen which makes him, knowing his rights, dare to maintain them, I think this point presented by him deserves slight consideration, for I think it suffices to say without more that no vested right can be enjoyed in this state to maintain cattle hosts as carriers of disease, merely upon the ground that the hosts have themselves acquired a tolerance for the disease which they nurture, maintain, and act as a carrier for in its full menace and vigor just as much as if the hosts themselves were subject to the disease, for in a settled community it is the menace to others which the law prohibits,

and no person can claim vested rights for himself in a condition which can exist only at the risk and expense of his neighbors.

It appears then to me that the Legislature, having full power to do so, has undertaken by a comprehensive scheme, a valid and constitutional purpose, to wit, to eradicate the fever-carrying tick from the cattle of this state, and that all the provisions of the act are designed and measured to that end.

That the Legislature has the right to institute and carry out methods of tick eradication under the general police powers of the state, and, that especially under the provisions of article 16, section 26, of the Constitution it has the right to require plaintiff and others similarly situated to take such measures, adopt such precautions, and put into operation such activities as will at least constitute a good-faith endeavor to free the state of the menace and burden at which the law is aimed, that, this being so, plaintiff's bill presents no equity for relief, and his prayer for injunction should be denied.

## Live Stock Tick Eradication.

### H. B. No. 77.

"An Act to provide for the eradication in the State of Texas of the fever carrying tick, Margaropus Annulatus, and making it the duty of the inspectors of the Live Stock Sanitary Commission to supervise the dipping of cattle, horses, mules, jacks and jennets, for the eradication of said fever carrying tick, Margaropus Annulatus from said live stock and from the premises, lands, territory, counties and parts of counties, in the State of Texas, and for the removal of exposure to said fever carrying tick, Margaropus Annulatus, and authorizing and requiring said Commission to establish necessary quarantines for the purpose of controlling and restricting the movement of said livestock, and for the purpose of preventing the spread of said infection and exposure to said fever carrying tick Margaropus Annulatus, and to eradicate the same, and requiring the county commissioners court to co-operate with said Commission in said work, and to provide dipping facilities, and making it the duty of owners and caretakers of cattle, horses, mules, jacks and jennets and of lands, premises and territory to dip said live stock under the supervision of inspectors of said Commission, and providing penalties for violation of quarantines established by said Commission, authorizing inspectors to enter private and public property and authorizing the Governor to issue proclamations designating counties and parts of counties for tick eradication purposes, and quarantining counties and parts of counties because of tick infestation; providing for the acquisition by counties of dipping vats and other facilities, authorizing and making it the duty of the Live Stock Sanitary Commission to employ necessary persons for carrying out and enforcing the provisions of this act; providing for the cleaning and disinfecting of railroad cars and other means of transportation, and for the manner and method of handling live stock by transportation companies; requiring stock yard companies to provide adequate facilities; defining the tick eradication area, the free area, and quarantined inactive area; making it the duty of the Live Stock Sanitary Commission to adopt and enforce rules and regulations for carrying out the provisions of this act; further prescribing the duties and authority of the Live Stock Sanitary Commission and authorizing the eradication of contagious diseases among live stock and animals and establishing quarantines thereon, and providing penalties for the enforcement of the requirements and provisions of this act; authorizing said Commission to issue written dipping directions to owners and caretakers of live stock; providing for said Commission to establish quarantines on hides and hay in quarantined territory and regulating the handling of sand for bedding cars; authorizing the issuance of search warrants permitting peace officers to seize and dip live stock at the owners' expense under the supervision of inspectors when owners and caretakers fail or refuse to dip them, and authorizing peace officers to seize and impound live stock which are moving in violation of penal provisions of this act, and providing a lien in favor of peace officers and others upon cattle seized and dipped and impounded; and providing for the enforcement of provisions of this act by injunctive and mandamus proceedings, providing the manner of alleging offenses in complaints and informations for violations that occur under provisions of this act; authorizing the employment of a chief veterinarian and assistant veterinarians; repealing Chapter 122 Acts of the Regular Session of the Thirty-ninth Legislature and Chapter 165 of the Acts of the Regular Secction of the Forty-first Legislature, and declaring an emergency."